**Mike Edgar DOSSETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–05–00119–CR.**

Court of Appeals of Texas,
San Antonio.

Aug. 23, 2006.

Rehearing Overruled Oct. 4, 2006.

Discretionary Review Refused
Feb. 28, 2007.

Kerrisa J. Chelkowski, Law Office of Kerrisa Chelkowski, San Antonio, for appellant.

Daniel Thornberry, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

Mike Edgar Dossett appeals his murder conviction. The court assessed a sentence of 40 years imprisonment, as recommended by the jury. On appeal, Dossett argues that: (1) the evidence is legally and factually insufficient to support his conviction; (2) the trial court erred by admitting DNA evidence; (3) the court erred by admitting his oral statements regarding a dream; (4) the court erred by admitting "other crimes" evidence during the guilt/innocence phase; and (5) the court erred by denying his motion for a mistrial based on a comment on his right to remain silent. We affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

The following statement of the case is based on the trial testimony. On June 6, 1983, Rachel Kosub, a 32 year old, 5′ 1″, 132 pound woman with mid-length brown hair, who was the secretary/office manager for Sandra Murphy Interiors, was found murdered inside the office building on Randolph Boulevard near the northeastern city limits of San Antonio. Kosub's body was found at approximately 9:30 p.m., after her family became worried. She had been sexually assaulted and strangled with her pantyhose. Her mostly nude body was found lying face down at the bottom of a staircase with a banister. Her dress was ripped open, pulled up over her buttocks and pulled down over her arms, her panties were missing, and her wrists were crossed behind her back with remnants of adhesive and marks indicating that she had been bound. Her pantyhose had been removed, and one leg of her hose had been cleanly cut off with a sharp instrument like a knife and used as a ligature which was tightly knotted around her neck. There were no defensive wounds on her body, and no signs of a struggle. The doors and windows to the building were locked and there was no sign of forced entry. Nothing was missing from the office, and Kosub's jewelry was still on her body. Kosub's last known contact with anyone was her 10:30 a.m. phone call to one of the interior designers to inquire about a ceiling fan catalog for a male customer who was there in the office.

On June 7, 1983, Dr. Susanna Dana, the assistant medical examiner, conducted the autopsy and created a sexual assault kit by taking oral, rectal and vaginal samples from Kosub, along with hair and fingernail clippings. She stated she usually makes two to three swabs, and between two and four slides, for each area. She retained one set of slides to stain for her own use, and sealed the swabs and the unstained slides inside the kit in separate containers. Dr. Dana found "abundant sperm" on the vaginal smear slide, some of which had tails indicating a fairly fresh deposit "within hours;" some sperm were also found on the rectal slide. Kosub's cause of death was determined to be strangulation by ligature. Based on the extent of rigor mortis and the pattern of lividity, her time of death was estimated to be between 10:00 a.m. and noon, and certainly before 5:00 p.m. According to standard procedure, Dr. Dana forwarded the sexual assault kit from the office of the Medical Examiner ("ME") to the San Antonio Police Department's Crime Lab where Jane Nellis performed a serology analysis on the samples and confirmed the presence of sperm. In 1983, DNA analysis was not being conducted.

In May 1984, based on a tip that Mike Dossett matched a composite sketch of the suspect in an aggravated robbery and attempted sexual assault committed in Live Oak, a community adjacent to the north-

eastern San Antonio city limits, Officer Gary Hopper and Chief Mark Jackley interviewed Dossett. After Dossett had waived his Miranda rights and completed his written confession to the Live Oak offense, and while he was waiting to speak with a Universal City officer about an aggravated sexual assault committed in Universal City, Dossett asked to speak with his wife and told Officer Hopper that he would then tell him about a dream that had been bothering him for about a year. After Dossett spoke with his wife, he told Hopper about a dream in which he was standing by the banister on a staircase in an office building and looking down at a nude woman laying dead at the bottom of the stairs with her buttocks in the air and her skirt over her face.[1] Recognizing the dream's description as matching the interior of Sandra Murphy Interiors, Officer Hopper felt the dream might be connected to the unsolved Kosub murder on nearby Randolph Boulevard. Hopper contacted the San Antonio Police Department and later transported Dossett to the police station for an interview on the Kosub case. The SAPD investigation into Dossett did not uncover any evidence linking him to Kosub's murder, other than his statements about the Banister Dream, and the Kosub investigation stalled.

In 1995, after Kosub's daughter inquired about the status of the investigation, Detective Tim Britt reviewed the case file and renewed the investigation. He again interviewed Dossett and obtained samples of his blood, hair and saliva for DNA analysis. Britt deposited the samples at the Bexar County crime lab, which was located in the same medical center building as the Medical Examiner's office. Britt later requested that Dossett's samples be subjected to DNA analysis and compared to the

samples in the Kosub sexual assault kit. Britt was informed by a lab serologist that he could not find the Kosub sexual assault kit, and therefore could not do a comparison. After speaking with Officer Hopper, Britt re-interviewed Dossett and inquired about the Banister Dream. Dossett initially stated he "did not really remember" the dream any more, but he agreed that he "probably" told that dream to Hopper. After more discussions, Britt obtained two written statements from Dossett about the Banister Dream. In one statement, Dossett described the dream as seeing himself standing by a banister and seeing a dead "girl laying naked all tied up;" he could not see her face; from the staircase he could look out a window. In the other written statement, Dossett further describes the view looking out the window, stating he could see out to the parking lot and could see bushes along the property line; he recalled the sun was out and it was not night; the staircase banister was plain and made of wood. Dossett states that he has had lots of dreams, and admits that "back then there was a part of me that I couldn't control, like part of me is evil. I could've had a dual personality." Dossett admitted being inside the interior design business one time around February or March 1983 to ask about a sponsorship for his baseball or softball team; he thought the secretary was there when he met with the owner. Dossett denied sexually assaulting and killing Kosub, however, and the investigation again grew cold.

In 2002, Detective George Saidler, who was assigned to the SAPD "cold case" squad, began reviewing and re-investigating the Kosub case. In 2003, over the span of several months, Detective Saidler inquired at the Bexar County Criminal

---

1. Throughout trial and on appeal, Dossett's dream is referred to as the "Banister Dream."

We too adopt that reference in the interest of simplicity.

Investigation Laboratory ("CIL")[2] about the Kosub sexual assault kit. When he was informed that the kit could not be found at the CIL, Saidler went to the Medical Examiner's offices where, by chance, he ran into the Chief Medical Examiner, Dr. Vincent DiMaio, who had been there since 1981. Upon being asked about the Kosub kit, Dr. DiMaio easily located the kit in the Toxicology Department's freezer. Saidler observed Dr. DiMaio remove the Kosub kit and saw that it was sealed. The kit was submitted to the CIL for DNA testing on April 17, 2003. The 20–year old samples in the kit were degraded, with mold, fungus, and bacteria present. However, sufficient genetic material was present to create a DNA profile and DNA analysis was completed on the swabs. Male DNA present on the vaginal swab "matched" Dossett's DNA—99.9 % of all other individuals were excluded as the donor. Dossett was indicted for Kosub's murder twenty years after it occurred.

At trial, Dr. Dana testified about the presence of sperm on Kosub's vaginal swab, as documented in her autopsy report, and Garon Foster, the CIL serologist, testified about the DNA evidence showing that Dossett could not be excluded as the donor of the male sperm on the vaginal swab. Foster stated that the presence of mold and bacteria on the samples did not alter the DNA profiles, but simply had consumed part of the genetic material. Dr. Dana stated that the presence of mold on the samples did not necessarily mean there was a lapse in protocol because she had seen mold grow even in properly maintained freezers. Officer Hopper was permitted to testify to Dossett's oral statements to him in 1984 about the Banister

Dream, and Dossett's two written statements about the dream given in 1995 to Detective Britt were admitted into evidence. Sandra Murphy described the physical layout of the interior and outside property of the design business, which was similar to Dossett's dream, and testified that Dossett had been at the business three times—once before Kosub's murder regarding a little league sponsorship, and twice after her murder looking at carpet and seeking a job. Finally, "other similar crimes" evidence was admitted showing that Dossett had committed the aggravated sexual assaults of Linda Feeley and Mary Jane Chisholm in October 1983 and May 1984 while each was working alone in a small office building in the same area as the Kosub murder scene.

In response, Dossett presented expert DNA testimony by Dr. Robert Benjamin, who stated his opinion that the Kosub samples had possibly been contaminated or tampered with during the 20–year period based on the presence of mold on the samples, bad record-keeping, including the lack of initials on the kit between 1983 and 2003, out-of-date lab procedures used during the 1980's, and the possibility of cross-contamination from a comparison with other sexual assault kits. He based his opinion on his review of the CIL file, and did not re-test any of the samples. The only other defense evidence was testimony by a 7–11 employee that she had given a statement that at approximately 11:00 a.m. on the day of Kosub's murder, she saw a white pickup truck parked at the interior design business; Dossett's ex-wife testified that he did not own a white pickup truck in 1983. The jury convicted Dossett of Kosub's murder, and he was sentenced to

---

**2.** The CIL was the new name of the crime lab, which had split off from the Medical Examiner's office and had become a separate entity under a new director; however, the CIL was still located in the same medical center building as the ME's office. The Toxicology Department remained part of the ME's office.

forty years imprisonment. Dossett timely appealed. We address Dossett's issues on appeal in a different order than stated in his brief to present a more logical explanation of our disposition in this case.

## DNA EVIDENCE

■ In his third and fourth issues, Dossett asserts the trial court erred by denying his motion to suppress the DNA evidence and admitting it at trial through Garon Foster's expert testimony about his DNA analysis and results. *See* TEX.R. EVID. 702, 705(b). All of Dossett's challenges to the DNA evidence are based on problems with the chain of custody of the Kosub sexual assault kit, and the possibility that the kit samples were contaminated or tampered with during the 20–year period between the kit's origination in June 1983 and the DNA analysis in April 2003.[3] Dossett also contends that any probative value of the DNA evidence was substantially outweighed by the danger of unfair prejudice under Rule 403. TEX.R. EVID. 403. Dossett does not, however, challenge the scientific reliability of the DNA analysis itself.

■ *Standard of Review.* In general, we review a trial court's decision to admit or exclude evidence during trial for an abuse of discretion, and will uphold the court's ruling as long as it lies within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim.App.1990) (opin. on reh'g); *Avila v. State*, 18 S.W.3d 736, 739 (Tex.App.-San Antonio 2000, no pet.). In reviewing a court's ruling on a motion to suppress evidence, we apply an abuse of discretion standard in which we defer to the trial court's determination of historical facts

that the record supports, particularly when the fact findings are based on evaluation of the witnesses' credibility, but review *de novo* the court's application of the law to the facts. *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex.Crim.App.1997); *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim. App.2002). When the trial court does not make explicit findings of historical fact, we review the evidence in a light most favorable to the court's ruling and assume the court made implicit fact findings that are supported by the record. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim. App.2000). In reviewing the trial court's ruling on a motion to suppress, we consider only what was before the court at the time of its ruling. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

*Analysis.* The court conducted a pretrial hearing on Dossett's motion to suppress at which testimony was presented concerning the chain of custody of the Kosub sexual assault kit from June 1983 to April 2003, and the possible contamination of, or tampering with, the samples in the Kosub kit during the 20–year period. At the hearing, Dossett argued that the DNA results in this case should be suppressed because: (1) the chain of custody of the Kosub kit from June 1983 to April 2003 was not established through records and was therefore incomplete; and (2) it was "possible" that the kit samples were contaminated, or tampered with, at some time between 1983 and 2003 because (i) mold or fungus had grown on the samples, indicating they were not continuously refrigerated, (ii) results of testing on the Kosub samples were compared to the Feeley and Chisholm results, and cross-contamination was possible if the samples were open in

---

**3.** Although Dossett references Fred Zain's tenure as a serologist at the Bexar County Crime Lab while it was part of the Medical Examiner's office and during the time the

Kosub kit was stored there, no evidence was presented that Zain ever handled any of the Kosub samples or had any connection to the Kosub case.

the lab at the same time, and (iii) the number of slides Foster found in the kit in 2003 did not match the number of slides Dr. Dana created. Dossett also argued that any probative value of the DNA evidence was outweighed by the risk of unfair prejudice under Rule 403. Tex.R. Evid. 403. The trial court denied the motion to suppress, ruling that the kit's chain of custody was not insufficient as a matter of law, and that the "failures of evidence" with regard to the chain of custody went to the weight of the evidence, not its admissibility. The court further ruled that it had conducted the Rule 403 balancing test, and found that the probative value of the DNA evidence outweighed any risk of undue prejudice under Rule 403.

 To admit the results of scientific testing, such as DNA testing, a proper chain of custody must be established. *See* Tex.R. Evid. 901; *Avila*, 18 S.W.3d at 739. Although the Rules of Evidence do not specifically define the terms "proper custody" or "chain of custody," Rule 901(a) provides that the authentication or identification of an item for admissibility purposes is satisfied by evidence that is sufficient to support a finding that the item in question is what its proponent claims. Tex.R. Evid. 901(a); *Silva v. State*, 989 S.W.2d 64, 67 (Tex.App.-San Antonio 1998, pet. ref'd); *Kingsbury v. State*, 14 S.W.3d 405, 407 (Tex.App.-Waco 2000, no pet.). Evidence may be authenticated or identified by different methods, including testimony by a witness with knowledge that "a matter is what it is claimed to be." Tex.R. Evid. 901(b)(1); *Kingsbury*, 14 S.W.3d at 407; *Angleton v. State*, 971 S.W.2d 65, 68 (Tex. Crim.App.1998). In making a preliminary determination about the admissibility of evidence, the trial court is not bound by the rules of evidence, except with respect to privileges. Tex.R. Evid. 104(a). The court does not abuse its discretion by ad-

mitting evidence based on a belief that a reasonable juror could find that the evidence has been authenticated or identified. *Avila*, 18 S.W.3d at 739; *see Pondexter v. State*, 942 S.W.2d 577, 586 (Tex.Crim.App. 1996). Proof of chain of custody goes to the weight of the evidence, rather than its admissibility. *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex.Crim.App.1997); *Silva*, 989 S.W.2d at 67–68 (explaining that chain of custody goes to weight, not admissibility, of evidence because Rule 901 does not require the State to "prove" anything, but only requires a showing that satisfies the court that the matter is what the State claims); *Garner v. State*, 939 S.W.2d 802, 805 (Tex.App.-Fort Worth 1997, pet. ref'd).

 Proof of the beginning and end of a chain of custody will support the admission of the evidence in the absence of any evidence of tampering or alteration. *Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim.App.1989), *disapproved of on other grounds by Leday v. State*, 983 S.W.2d 713 (Tex.Crim.App.1998); *Garcia v. State*, 537 S.W.2d 930, 934 (Tex.Crim.App.1976); *Penley v. State*, 2 S.W.3d 534, 537 (Tex. App.-Texarkana 1999, pet. ref'd); *Avila*, 18 S.W.3d at 739. Thus, gaps or theoretical breaches in the chain of custody do not affect the admissibility of the evidence, absent affirmative evidence of tampering or commingling. *Lagrone*, 942 S.W.2d at 617; *Silva*, 989 S.W.2d at 68. The State has no burden to disprove tampering or commingling; rather, the appellant has the burden to present affirmative evidence of tampering or commingling. *Stoker*, 788 S.W.2d at 10; *Garcia*, 537 S.W.2d at 934. A showing of the *possibility* of tampering or commingling is not sufficient to bar admission of the evidence, and goes only to the weight of the evidence. *See Darrow v. State*, 504 S.W.2d 416, 417 (Tex.Crim.App. 1974) (evidence that marihuana was stored in officer's locker for two weeks in room to

which others had access, but no key to locker, showed only the possibility of tampering, and did not prohibit admission). In addition, the mere passage of time is no evidence of tampering. *See Lagrone,* 942 S.W.2d at 617 (absent affirmative evidence of tampering, no reason to exclude evidence merely because it was kept in evidence room for extended period of time and had undergone prior forensic testing).

Here, the State's evidence as to chain of custody of the Kosub samples consisted of the initials and dates on the Kosub kit itself, the property receipt documenting the kit's transfer from the ME's office to the SAPD Crime Lab on June 8, 1983, and the testimony by Dr. Susanna Dana, Jane Nellis, Detective George Saidler, and Garon Foster about their personal knowledge of the kit, as well as about the standard protocol for handling, storing and documenting the custody of sexual assault kits. Dossett presented the expert testimony of Dr. Robert Benjamin. The evidence presented at the hearing is summarized below.

Dr. Dana testified she created the samples in the Kosub kit on June 7, 1983. She testified she generally makes between 2 and 4 sets of swab samples, makes unstained smear slides from the swabs, and keeps one set of slides for herself as a back up. The set of slides she kept as her back-up set were stained and evaluated, and formed the basis of her finding of "abundant sperm" stated in the autopsy report; her back-up slides were stored in the ME's secure file storage cabinet from 1983 to 2003.[4] Dr. Dana separately stored the Kosub swabs and unstained slides inside the kit and sealed the box with tape, marking her initials, the date, and the ME case number on the outside of the box.

The kit box was stored in the Toxicology Department's freezer at the ME's office.

On June 8, 1983, as documented by a signed property receipt, the Kosub kit was transferred from the ME's office to the SAPD Crime Lab, where it was logged in. Jane Nellis, the serologist at the SAPD Crime Lab, testified the kit was sealed when she received it, and she placed her initials on the outside of the kit, along with the SAPD Crime Lab case number indicating the year 1983. Nellis stated she had no specific memory of testing the kit, and did not retain a copy of her report; despite the State's efforts, Nellis' report could not be located for Dossett's trial. Nellis testified that her standard practice was to store the kits in her presence in the lab's refrigerator, to test the kit samples within one week of receipt, and then to send the kit back to the ME's office, sometimes taking it herself. Nellis testified that she always documented the kit's transfer out of the SAPD Crime Lab and back to the ME's office with a receipt, which would have been stapled to her report; the receipt was never produced at trial. Nellis described the standard procedures used at the lab in 1983 as "more than adequate to prevent contamination" under the guidelines at that time, and stated that she was "positive" that she used the same procedures on all the cases she analyzed. Those procedures consisted of working on only one kit at a time, wearing gloves but not switching gloves between clippings of the swabs, and wiping the instruments with dry gauze between clippings to avoid cross-contamination. She stated they did not use disposable instruments in the lab in 1983; Garon Foster later testified that even in 2003, the crime lab did not use only disposable instru-

---

4. In April 2004, upon the district attorney's request, Dr. Dana submitted the slides from her back-up set to the CIL for DNA testing; however, no DNA analysis could be done on Dr. Dana's slides because they were too degraded.

ments, but cleaned their instruments with bleach to avoid contamination. Finally, Nellis stated that she would generally complete the testing on a kit within about one week of receipt, even if there was no suspect; she said it was possible, however, that she held the Kosub kit pending a suspect for comparison.

Nellis testified that in late 1983 or early 1984, at a detective's request, she prepared an informal comparison report which compared the serology test results (blood type, enzyme profile, secretor or non-secretor status) in the Kosub case with the results in three other sexual assault cases—Chisholm, Feeley and a third case. The purpose of the comparison was to determine whether the perpetrator in all three cases was the same person; the test results in the Kosub case matched the results in the Chisholm and Feeley cases. Nellis did not know the name of the suspect was Dossett at the time of the comparison. Nellis stated that her procedure would have been to compare the various test results "on paper only," and she would not have re-tested the case samples at the time of the comparison; thus, she would not have had the samples from all or any of the three cases open in the lab at the same time. Nellis stated that she had "no doubt" that she did not process the suspect's samples at the same time as the Kosub samples. In addition, Nellis stated she had no reason to think that the kit samples were open in the lab at the same time because the three offense dates were separated by several months, and the lab case numbers were not chronologically close. Based on the dates of the offenses and case numbers, and in view of her procedure of testing the kits within one week of their submission to the lab, Nellis concluded that each case's samples were tested individually and at different times; therefore, there was no cross-contamination risk. Finally, Nellis stated that if there had been cross-contam-

ination between the three samples, one would expect to find one of the other female victim's DNA on the Kosub swab and it was not present.

In 1985, a serology department opened within the ME's office under Dr. DiMaio, and Nellis came over from the SAPD Crime Lab and worked as the serologist in the ME's lab until 1988. Nellis testified that she personally brought all the SAPD Crime Lab rape kits with her to the ME's office in 1985. No record was produced showing the date on which the Kosub kit was returned to the ME's office from the SAPD Crime Lab, and Nellis had no specific memory. Nellis stated it was possible that the Kosub kit remained at the SAPD Crime Lab until she moved it to the ME's office in 1985. Dr. Dana testified that through 1992 the standard place to store rape kits at the ME's office was in the Toxicology Department freezer. In 1993, the ME's office moved from downtown to a building in the medical center, and the old kits were transported to the new building and stored in the ME's Toxicology Department freezer. In 1995, the crime lab became a separate entity, the Criminal Investigation Laboratory (CIL), under a new director, although the lab was still housed in the same building as the ME's office.

Detective George Saidler testified that when he took over the Kosub investigation in 2002, he spoke with Detective Tim Britt, who told him that in 1995 he submitted Dossett's samples to the crime lab for a comparison to the samples in the Kosub kit but he was informed by lab personnel that the Kosub kit could not be found at the crime lab. Detective Saidler testified that Britt never said he had looked for the Kosub kit at the ME's office in 1995; Britt did not testify at the suppression hearing. With respect to why the Kosub kit could not be found in 1995, Garon Foster, Technical Leader of Serology at the CIL, testi-

fied that the crime lab separated from the ME's office in 1995 and became a separate entity under a new director. Foster stated that in 1995 he did not know that the old rape kits were still stored at the ME's office; he did not learn that fact until April 2003. Dr. Dana testified that *if* she had been asked to look for an old rape kit in 1995, she would have looked only at the new CIL, and would not have thought to look in the ME's Toxicology freezer; she would have assumed all the kits were moved to the CIL.[5] In April 2003, after being told by CIL personnel that the Kosub kit was not there, Detective Saidler went over to the ME's office and asked Dr. DiMaio about the "missing" Kosub kit. Dr. DiMaio immediately went to the ME's Toxicology Department freezer and located a box with all the 1980's rape kits. He removed the Kosub kit from the freezer in Saidler's presence. Upon Saidler's request, the kit was then submitted to the CIL for DNA testing.

Garon Foster, a serologist at CIL, testified the Kosub kit was taped and sealed when he received it on April 17, 2003. Foster stated the samples were degraded, and the swabs had fungus, mold and bacteria growing on them. He had never seen 20–year old samples before, and documented their condition with photographs. Foster testified, however, that mold, fungus and bacteria would not alter a DNA profile on a sample, but would simply consume parts of the sample making it harder to obtain enough genetic material to create a DNA profile. In his preliminary examination using a microscope, Foster saw what appeared to be sperm on a sample, but was unable to positively confirm it was sperm due to the degraded condition of the sample. In his subsequent DNA analysis

conducted in June 2003, Foster positively identified sperm on the vaginal swab and was able to create a genetic profile which was consistent with Kosub and a "foreign donor." He then created a genetic profile from Dossett's known blood sample stored at the lab since 1995 and compared it to the foreign donor's DNA on Kosub's vaginal swab. Dossett's DNA was consistent with the DNA on the vaginal swab—99.9% of other donors were excluded. Because the Kosub swab was so old, and to "cover all the bases," Foster also created a genetic DNA profile from the vaginal smear slide; he found unknown female DNA on the vaginal slide that did not belong to Kosub. Foster stated the slide could have been contaminated by Dr. Dana when she prepared it. Foster also testified to two minor instances of contamination during the DNA testing process, neither of which involved contamination of an actual Kosub sample: (1) Foster's own DNA showed up in a reagent solution used in the DNA process, but the solution was discarded and the process was re-started using a fresh solution; and (2) the DNA of another lab analyst showed up at a "below threshold" level on a blank specimen, which Foster said could have occurred through the handling of materials in the lab. Both these instances of minimal contamination were corrected and reported by Foster according to protocol.

Finally, Dr. Benjamin testified that due to the poor record-keeping, and lack of any initials on the kit during the period between 1983 and 2003, it was possible the kit had been opened and tampered with or contaminated. He opined that wiping the instruments with dry gauze between clippings was not sufficient to remove all DNA, there was an "extreme risk" of

---

**5.** She had left the ME's office and worked at another job in Austin from 1992 to 1995, but returned to the Bexar County ME's office in 1996. She stated that when she returned in 1996, the CIL had already been formed.

cross-contamination if Nellis had the comparison samples out at the same time as the Kosub samples, and based on Dr. Dana's testimony there "should have been two to three sets of slides in the kit" when Foster opened it in 2003, but he only found one slide, indicating the kit had been opened and tampered with. Dr. Benjamin testified that he did not know how to assign a probative value for the DNA evidence because of the small quantity, the out-dated procedures used, the degradation of the samples, and the lack of records.

Dossett asserts that the evidence presented at the suppression hearing shows an "apparent" break in the chain of custody because the Kosub kit was "missing" in 1995 when Britt asked for it, and there is no way to "prove or disprove" whether the samples were tampered with during the 20–year period the kit was "unaccounted for." However, the testimony showed that in 1995 when Britt submitted Dossett's samples to the CIL and asked for a DNA comparison with the Kosub samples, the CIL had just become a separate entity from the ME's office and was no longer being supervised by Dr. DiMaio, whose corporate knowledge dated back to 1981. Foster at the CIL did not know in 1995 that the old rape kits were still stored in the ME's Toxicology freezer; Saidler stated Britt never said he asked for the kit at the ME's office in 1995; and Dr. Dana stated she never would have thought to look for the kit in the ME's office in 1995, only at the CIL. There was no evidence that anyone looked for the Kosub kit at the ME's office, or particularly, in the Toxicology Department, and could not find it there in 1995; the evidence merely showed that the Kosub kit was not at the CIL in 1995. Furthermore, although there was speculation, there was no evidence that the Kosub kit was opened after Nellis sealed it in June 1983 and before

Foster opened it in April 2003. Based on the evidence presented at the hearing, the trial court could have reasonably found that the State established the beginning and end of the chain of custody through the testimony of Dr. Dana and Nellis, and their initials on the kit, and Foster's testimony that the kit was sealed when he received it in 2003 with only Dana's and Nellis' initials. "When the State completes the chain of custody from the initial collection of the evidence to inside the laboratory, most questions concerning care and custody, including gaps and minor theoretical breaches, go to the weight of the evidence, not its admissibility." *Avila*, 18 S.W.3d at 739. The court did not abuse its discretion in concluding there was sufficient authentication evidence through the kit's markings and the witness testimony to show the kit was what it purported to be. *See id.* at 740 (Rule 901 only requires a showing that satisfies the trial judge that the item in question is what the State claims).

Further, there was no affirmative evidence that the Kosub samples were commingled, altered, or tampered with prior to their submission for DNA testing in April 2003. At most, Dossett showed a *possibility* of contamination or tampering, which is insufficient to exclude the evidence. *Stoker*, 788 S.W.2d at 10; *Darrow*, 504 S.W.2d at 417. With respect to the mold, testimony varied as to why it was present. Dr. Benjamin testified that its presence showed moisture had formed on the samples at some time, possibly during the 1993 move to the ME's new building; Foster also stated it was "probable" the samples were not refrigerated during the move, although he did not begin working there until 1994; Dr. Dana testified that it was possible for swabs to grow mold or fungus even though maintained in a freezer because opening and closing the doors made

it impossible to maintain a constant temperature. However, both Dr. Benjamin and Foster agreed that the presence of mold, fungus, or bacteria would not alter the DNA profile of the samples, but would merely consume parts of the samples and reduce the quantity of DNA material available to make a profile.

With respect to cross-contamination of the samples, Dr. Benjamin's opinion that there was an "extreme risk of cross-contamination" was predicated on the possibility that Nellis had opened the other samples at the same time as the Kosub samples. Nellis, however, testified that she only compared the serology results in the Kosub, Feeley and Chisholm cases on paper, and would never have had the various samples open in the lab at the same time based on her standard procedure of working on one kit at a time and the separation between the three case numbers; therefore, she concluded that, although she had no specific memory, there was no cross-contamination between the samples in the three cases. Finally, Dr. Benjamin stated that the number of slides found by Foster in the kit in 2003 did not match the number of slides Dr. Dana testified she initially prepared and sealed inside the kit. Dr. Dana, however, did not remember the exact number of slides she placed in the kit, stating only that she generally prepared between two and four sets of slides, and always retained one set for herself. Based on the record before us, we conclude that, while there was speculation by Dr. Benjamin, there was no affirmative evidence that the Kosub kit had been commingled, contaminated, altered or tampered with between 1983 and 2003.

■ Finally, Dossett argues the probative value of the DNA evidence was outweighed by the danger of unfair prejudice because it only shows that he had sex with Kosub, not that he killed her, thereby confusing the issues and misleading the jury. See Tex.R. Evid. 403. The probative value of the DNA evidence was very high, as it was the only evidence directly linking Dossett to Rachel Kosub and to the murder scene. It provided the evidentiary basis for a reasonable inference that Dossett, having been present and having sexually assaulted Kosub, then killed her; therefore, it made a fact of consequence more probable and was relevant to the question of who murdered Kosub. See Tex.R. Evid. 401. The prejudicial nature of the DNA evidence was no higher than other inculpatory scientific evidence, and was not *unfairly* prejudicial. We hold the court did not abuse its discretion in finding the probative value of the DNA evidence was not substantially outweighed by the danger of unfair prejudice. See Mozon v. State, 991 S.W.2d 841, 847 (Tex.Crim.App.1999) (listing criteria for consideration in determining whether trial court abused its discretion in conducting Rule 403 balancing test).

## ORAL STATEMENTS ABOUT THE "BANISTER DREAM"

In his fifth and sixth issues, Dossett argues the trial court abused its discretion in denying his motion to suppress his oral statements about the "Banister Dream" and in admitting the testimony of Officer Gary Hopper concerning Dossett's oral statements about the dream. Specifically, Dossett asserts his oral statements about the dream should have been excluded because they were the product of custodial interrogation and were not recorded, they had no probative value or relevance because they were speculative, and the danger of unfair prejudice outweighed any probative value. The State responds that the oral statements were an admission showing Dossett's knowledge of crime scene details not disclosed to the public, were not the product of custodial interro-

gation, were probative of a fact in issue, and the probative value was not outweighed by the danger of unfair prejudice.[6]

### Pre–Trial Motion to Suppress.

■ Dossett filed a pre-trial motion to suppress the oral statements as involuntary because they were the product of custodial interrogation without *Miranda* warnings or recording under article 38.22 of the Texas Code of Criminal Procedure. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3 (Vernon 2005); *see also Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (delineating the required warnings and defining "custodial interrogation" as questioning initiated by law enforcement officers after a person has been taken into custody or significantly deprived of his freedom). A pre-trial suppression hearing was held, and the trial court entered written findings of fact and conclusions of law finding that Dossett's oral statements about the dream, while arguably made while he was in custody, were made spontaneously after he confessed to the other offenses for which he had been Mirandized; thus, the statements were not the product of custodial interrogation and were admissible under § 5 of article 38.22. Tex.Code Crim. Proc. Ann. art. 38.22, § 5 (Vernon 2005). We review a trial court's ruling on a motion to suppress for an abuse of discretion, affording almost total deference to the trial court's determination of historical facts that the record supports, especially when based on an evaluation of the witnesses' credibility and demeanor, but reviewing *de novo* the court's application of the law to the facts. *Guzman*, 955 S.W.2d at 88–89; *Balentine*, 71 S.W.3d at 768.

■ With respect to Dossett's pre-trial motion to suppress, there is no dispute that Dossett's oral statements about his dream were not recorded at the time they were made on May 3, 1984. Therefore, their admissibility turns on whether the statements were the result of custodial interrogation; if so, they had to be recorded to be admissible. *See* Tex.Code Crim. Proc. Ann. art. 38.22, § 3(a). Inculpatory oral statements are admissible if they are not the result of custodial interrogation and are given freely, voluntarily and without compulsion or persuasion. *Shiflet v. State*, 732 S.W.2d 622, 624 (Tex.Crim.App. 1985); *Escamilla v. State*, 143 S.W.3d 814, 824–25 (Tex.Crim.App.2004).

At the suppression hearing, Officers Hopper, Dewey and Chief Jackley testified that Dossett had already been read his Miranda rights and confessed to the other offenses they were separately investigating before he spontaneously mentioned the Banister Dream. Hopper and Jackley were investigating Dossett for an aggravated robbery/attempted sexual assault in Live Oak, while Dewey was investigating Dossett for Mary Jane Chisholm's aggravated sexual assault in Universal City. Officer Hopper and Chief Jackley testified that after Dossett had signed his written confession to the aggravated robbery in Live Oak and was no longer being interrogated, and while he was waiting for Officer Dewey to arrive, he volunteered that a dream had been bothering him for about a year and began describing the Banister Dream. Likewise, Officer Dewey testified that Dossett started talking about the Banister Dream on his own initiative, after

---

6. In its brief, the State also addresses the admissibility of Dossett's two written statements about the dream. Reading Dossett's brief liberally, we do not construe his fifth and sixth issues as encompassing a challenge to the admission of his written statements, and, therefore, do not address the admissibility of the written statements. *See* Tex.R.App. P. 38.1(e), (h), 38.9.

the interrogation had ended and he had signed his written confession to the Chisholm sexual assault. Dewey remembered Dossett's statement as describing a dream in which he saw "a lady that he had killed in a shop that was by herself and that he had dreamed that he had ... strangled her and left her nude below some stairs."

We conclude that Dossett's oral statements about the Banister Dream were not the product of custodial interrogation, but were spontaneous and voluntary and thus admissible under § 5 of article 38.22. Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (providing that the recording requirement does not apply to a statement that does not stem from custodial interrogation); Escamilla, 143 S.W.3d at 824–25; Shiflet, 732 S.W.2d at 624. Even though Dossett was arguably in custody, all of the evidence at the suppression hearing, as well as at trial, showed that he spontaneously started talking about the dream after his interrogations on the other offenses were completed and his confessions were signed. There was no evidence of police questioning, coercion or inducement leading to his oral statements about the dream; rather, the testimony was that Dossett initiated the discussion and was "eager to talk" about the Banister Dream. Many cases have held that such spontaneous, volunteered statements not made in response to interrogation are admissible, whether or not the defendant is in custody. See, e.g., Earnhart v. State, 582 S.W.2d 444, 448 (Tex.Crim.App. [Panel Op.] 1979) (at time of arrest for murder, defendant picked up a shirt and said, "That's got blood on it, I don't want to wear that ... I'd like to get a clean shirt," and statement was held admissible); Wiley v. State, 699 S.W.2d 637, 638–39 (Tex.App.-San Antonio 1985, pet. ref'd, untimely filed) (holding that defendant's statement, "Okay, I did it," made after being shown bloody clothes and bloody knife, was not in response to inter-

rogation and was admissible); Smith v. State, 949 S.W.2d 333, 339 (Tex.App.-Tyler 1996, pet. ref'd) (holding captured defendant's unsolicited statement that it would not take him as long to escape from prison the next time was admissible); Higgins v. State, 924 S.W.2d 739, 743–45 (Tex.App.-Texarkana 1996, pet. ref'd) (holding defendant's spontaneous statement that he killed his wife made while in custody and in the back seat of police car was not the product of police questioning, and was voluntary and admissible); DeLeon v. State, 758 S.W.2d 621, 625 (Tex.App.-Houston [14th Dist.] 1988, no pet.) (defendant was handcuffed and questioned about a prison stabbing due to a blood stain on his knee; his statement in response to police questioning about the location of the knives was suppressed, but his later, spontaneous statement, "I killed him," was held voluntary and admissible); Villarreal v. State, No. 04–05–00287–CR, 2005 WL 2989526, at *2 (Tex.App.-San Antonio Nov. 9, 2005, pet. ref'd) (not designated for publication) (holding defendant was in custody, but was not being interrogated at the time of his spontaneous admission that he killed his mother while officer was escorting him to an interview room).

Moreover, Dossett's statements about his dream do not directly relate to his commission of the other offenses for which he was in custody. See Lindley v. State, 635 S.W.2d 541, 544 (Tex.Crim.App. [Panel Op.] 1982) (while under arrest for unrelated offense, defendant orally described the unique features of his shotgun to officers; one month later, a shotgun matching the description was used in a robbery and found at the scene; defendant's earlier description was admissible at his robbery trial); Schuessler v. State, 647 S.W.2d 742, 747 (Tex.App.-El Paso 1983), rev'd on other grounds, 719 S.W.2d 320 (Tex.Crim.App.1986) (defendant, who was in custody

for traffic offenses and mental health evaluation, gave narrative answer detailing how he strangled his daughter in response to officer's question about his marital status, and the volunteered admission was held admissible at his subsequent murder trial); *Johnson v. State*, 746 S.W.2d 791, 796 (Tex.App.-Corpus Christi 1987, pet. ref'd) (defendant, in custody for shoplifting in Ohio, made spontaneous statement to Ohio officer admitting he committed a murder on South Padre Island and statement was held admissible in murder trial). Finally, Dossett called Hopper about the dream a few days later from jail, which reinforces the conclusion that his statements about the dream were not the result of interrogation, but were entirely voluntary. The trial court did not abuse its discretion in denying Dossett's motion to suppress.

### Trial Objections.

■ During trial, Dossett re-urged his prior objections, and also objected that his oral statements about the Banister Dream were not relevant or probative of any fact at issue because they were "not scientifically based;" he also asserted that any probative value was outweighed by the danger of unfair prejudice.[7] *See* Tex.R. Evid. 401, 403. Dossett also filed a supplemental motion to suppress raising these grounds under Rules 401 and 403. The trial court overruled the objections, and admitted Hopper's testimony concerning Dossett's oral statements about the dream. We review a court's ruling admitting or excluding evidence during trial for an abuse of discretion. *Montgomery*, 810 S.W.2d at 391; *Willover v. State*, 70 S.W.3d 841, 845 (Tex.Crim.App.2002). We will uphold the court's ruling if it is reason-

ably supported by the record and is correct under any theory of law applicable to the case. *Willover*, 70 S.W.3d at 845; *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim.App.2000). We review the ruling in light of what was before the trial court at the time. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

At trial, over Dossett's objections, Hopper testified to his memory of the Banister Dream as related by Dossett on May 3, 1984. Hopper stated that Dossett described himself looking down from a stairway with a banister in an office building and seeing a nude lady laying dead on the floor with her buttocks up in the air; he could not see her face because her dress was covering it. Hopper knew of the Kosub murder and was familiar with the interior of the Sandra Murphy design business, knowing it had stairs and a loft. Hopper testified, however, that he had not seen the Kosub crime scene photos at the time of Dossett's statements, and did not suggest any details of the crime scene to Dossett; he stated all of the details in the dream came from Dossett on his own. Hopper connected Dossett's dream to the nearby unsolved murder, and contacted a SAPD homicide detective about Dossett's statements. It was only after Hopper got to the SAPD station that he first saw the Kosub crime scene photos and realized they closely matched Dossett's dream. Finally, Hopper testified that a few days later, Dossett telephoned him from jail and told him the dream was still bothering him and he needed help; Hopper passed the information along to the SAPD detective.

Dossett asserts that his statements about the dream have no relevance and are

---

7. Dossett initially raised his Rule 403 objection to the testimony about his oral "dream" statements in a motion in limine and related pre-trial hearing. During Hopper's trial testimony, he re-urged "all prior objections," but

did not specifically direct the trial court's attention to his Rule 403 objection at that time. We will consider Dossett's Rule 403 complaint raised on appeal in the interest of a full disposition of this issue.

not probative of any fact in issue because a dream is not scientifically based, and is merely speculative. Dossett cites no case authority in support of that proposition. To the contrary, a defendant's oral statements about his dreams have been held probative of the defendant's intent to commit the charged offense and admissible. *See, e.g., Scott v. State,* 861 S.W.2d 440, 446–47 (Tex.App.-Austin 1993, no pet.) (upholding admission of testimony by defendant's wife that defendant told her about his dreams in which he was killing her and other people as probative of his intent to commit offense of attempted capital murder); *State v. Ridenour,* No. 07–05–0339–CR, 2006 WL 947749, at *3 (Tex.App.-Amarillo 2006, no pet.) (not designated for publication) (holding court erred in suppressing defendant's inculpatory, but voluntary, statements made at police station about not remembering what he did during blackouts, wondering if he was dreaming, having a bad temper and never being in trouble until then).

Here, Dossett's oral statements revealed his knowledge of details about the Kosub crime scene that had not been released to the public, particularly, the location and position of the body inside the business. Detective Saidler testified that the details in Dossett's dream were not mentioned in the press releases and news articles during that time. Whether his oral statements are characterized as a dream, a thought, or a memory, they are inculpatory admissions that are probative of his guilt in this case; therefore, the statements were relevant. Dossett also asserts that Hopper's testimony about the Banister Dream was unreliable because Hopper made no written statement, report, or notes memorializing Dossett's oral statements at the time they were made; it was not until approximately twelve years later that Hopper gave a written statement about the dream to Detective Britt as part

of his renewed Kosub investigation. This complaint, however, goes to the weight and credibility of Hopper's testimony about the dream, not its admissibility.

 Having found Dossett's statements about the Banister Dream relevant, we must determine whether the trial court abused its discretion in failing to exclude them under Rule 403. Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex.R. Evid. 403. In reviewing the court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, we consider the following factors: (1) how compellingly the evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury "in some irrational but nevertheless indelible way;" (3) the time needed by the State to develop the evidence; and (4) the force of the State's need for the evidence to prove a fact of consequence, *i.e.,* whether there was other probative evidence available to establish the same fact. *Mozon,* 991 S.W.2d at 847 (citing *Montgomery,* 810 S.W.2d at 389–90).

Here, the probative value of Dossett's statements about the dream was strong because they constituted an admission against interest, revealing Dossett's knowledge of crime scene details not disclosed to the public. The time used to develop the evidence during trial was relatively brief, as the State only called Officer Hopper to testify about the Banister Dream, even though Dossett made the same types of oral statements about the dream to Officer Dewey and Chief Jackley. The State's need for the evidence was high as the only other evidence linking Dossett to Kosub's murder was the DNA evidence showing the presence of his sperm and his commis-

sion of other sexual assaults in the area; the dream evidence was the only direct evidence of Dossett's intent to kill Kosub, rather than just sexually assault her. Finally, the risk that the jury would be improperly impressed with the evidence did not outweigh the high degree of need and probative value of the dream evidence. We conclude the court did not abuse its discretion in finding the probative value of the dream evidence was not substantially outweighed by the danger of unfair prejudice, and in admitting it at trial. Dossett's issues challenging admission of the testimony about the Banister Dream are overruled.

### "OTHER CRIMES" EVIDENCE

■ In his eighth issue, Dossett asserts the trial court abused its discretion by admitting evidence of two prior offenses during the guilt/innocence phase of his trial, in violation of Rule 404(b) of the Texas Rules of Evidence. TEX.R. EVID. 404(b). Specifically, Dossett complains of the testimony by Linda Feeley and Mary Jane Chisholm, two prior victims of aggravated sexual assaults committed by Dossett in 1983 and 1984. The State specifically offered the "other crimes" evidence to prove the issue of identity under Rule 404(b). *See* TEX.R. EVID. 404(b) (providing that "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith ... [but] may, however, be admissible for other purposes, such as proof of ... identity ..."). Dossett objected, arguing that identity had not been put in issue, and that the aggravated sexual assaults were not so similar to the Kosub murder that they amounted to a "signature" or modus operandi.[8] After a

hearing outside the jury's presence, the trial court ruled the "other crimes" evidence was admissible under Rule 404(b) on the disputed issue of the identity of Dossett as Kosub's murderer. Before permitting the victims to testify, the court instructed the jury that the "other crimes" evidence was only to be considered if they found beyond a reasonable doubt that Dossett had in fact committed the other crimes, and if so, only to prove identity in connection with the Kosub murder; the same instruction was submitted in the charge.

■ *Standard of Review.* We review a trial court's admission of extraneous offense evidence for a purpose other than character conformity under an abuse of discretion standard. *Montgomery,* 810 S.W.2d at 391; *Lane v. State,* 933 S.W.2d 504, 519 (Tex.Crim.App.1996). As long as the court's ruling is within the zone of reasonable disagreement, we will not disturb the ruling on appeal. *Montgomery,* 810 S.W.2d at 391.

*Analysis.* Linda Feeley testified for the State in rebuttal about an aggravated sexual assault that Dossett committed against her on Tuesday, October 18, 1983. At that time, Feeley was a 33 year old, 5' 2", 130 pound woman with mid-length brown hair. Feeley testified that at approximately 9:30 a.m., while she was working alone at a sole practitioner's law office on Austin Highway in northeast San Antonio, Dossett entered and asked to speak with the attorney about an automobile accident. After she set up an appointment with the attorney for the next day, Dossett left; however, she saw him walk to his car, remove an item and come back into the office. Dossett continued talking with Feeley and asked to make a phone call.

---

8. Dossett also objected that the prejudicial effect of the "other crimes" evidence outweighed any probative value under Rule 403, but does not raise this issue on appeal. TEX. R. EVID. 403.

She became nervous when he would not leave and walked back into her work space. Feeley tried to exit the front door, but Dossett pushed Feeley up against a wall, holding a six inch pocket knife to her side. Dossett dragged her around the office while he locked all the doors and closed the window blinds. Dossett sat Feeley in a chair and bound her hands behind her back with duct tape.[9] He took cash and an ATM card from her purse, and looked through the desk drawers. At one point, she was able to loosen the tape and ran toward the door, but Dossett caught her and dragged her back. She told him she was afraid of the knife and asked him to put it on the other side of the office, which he did. He also duct taped her hands in front of her, instead of behind, as she had requested. After he finished looking through the office, Dossett told Feeley to get undressed; she testified that she must have been unbound at this time. She undressed, and, remembering the woman who had been strangled with her own hose a few months before in a nearby office, she threw her hose and underwear across the room. Dossett undressed and sexually assaulted her by vaginal penetration with ejaculation; he then left. Feeley was taken to the hospital where a sexual exam was performed and samples were taken. The police found the knife at the scene. Feeley testified Dossett was able to physically overwhelm her, and she had believed he would kill her if she did not cooperate. In May 1984, she heard of a similar rape in Universal City and called the police, believing it was the same man. Feeley picked out Dossett from a photo lineup. She later learned that he had pled guilty to a sexual assault, but was not sure if it was her case.

Mary Jane Chisholm testified that at approximately 10:00 a.m. on March 8, 1984, while she was working alone at a small placement agency on Pat Booker Road in Universal City, Dossett entered looking for employment. She stated that most of the placement agency's business was done through the mail and by phone, with little foot traffic; it was a two-person office, but her employer was away at a conference that day. At that time, Chisholm was 5′ 5″, 125 pounds, with mid-length hair. She walked up front to talk to Dossett, wrote down the name and address of a construction company for him, and approached the front door to point at the company's office. Dossett then grabbed Chisholm around the neck, and held a hunting knife against her neck. He dragged her to an upstairs area where he laid her down on her stomach, bound her hands behind her back with duct tape, and taped her mouth. Chisholm did not know whether he locked the front door. Dossett looked through her purse and took $15 cash and her driver's license; he also took her jewelry. He was angry there was not more money, and said that he was "gonna get more out of this than a lousy $15." He then rolled her over, took her clothes off, and sexually assaulted her through vaginal penetration. Dossett went downstairs and Chisholm heard the door slam shut. He shortly returned, however, and ripped the tape from her mouth and cut her hands free; he took the bindings with him when he left. She had a sexual exam done at the hospital, and shortly afterward made a photo identification of Dossett as her assailant. At trial, Chisholm could not make a positive identification of Dossett as he looked in the courtroom, but identified him in the same

---

9. On cross-examination, Feeley admitted that her written statement said Dossett used black electrical tape, but she was adamant that he had used duct tape, stating that she knew the difference and the officer had wrongly described the tape as electrical tape in the statement.

photo she had used to identify him in 1984. The police chief from Universal City, Chief Jackley, then testified that the photo showed how Dossett looked in 1984, and that the same man was present in the courtroom.

On appeal, Dossett complains that the court erred in admitting the testimony by Feeley and Chisholm because the two sexual assaults are not so similar to Kosub's murder that they were admissible to prove identity under Rule 404b. While evidence of the commission of other offenses by the defendant is generally not admissible to prove he committed the charged offense, it may be admissible to prove identity when it is a disputed issue in the case. TEX.R. EVID. 404(b); *Lane*, 933 S.W.2d at 519. The extraneous offense must be so nearly identical in method to the charged offense that the offenses are marked as the defendant's "handiwork." *Lane*, 933 S.W.2d at 519; *Johnson v. State*, 68 S.W.3d 644, 650–51 (Tex.Crim. App.2002). In other words, the defendant's "signature" must be apparent from a comparison of the circumstances in the cases. *Bishop v. State*, 869 S.W.2d 342, 346 (Tex.Crim.App.1993) (the characteristics must be so unusual and distinctive that they are like a signature). To obtain admission of the extraneous offense evidence, the State must show more than merely the repeated commission of the same type or nature of criminal offense. *Owens v. State*, 827 S.W.2d 911, 915 (Tex.Crim.App. 1992).

In determining whether the similarity between the offenses is sufficient, the court should consider both the specific characteristics of the offenses and the time interval between them. *Johnson*, 68 S.W.3d at 651. Sufficient similarity between the offenses may be shown by proximity in time and place, *or* by a common mode of committing the offenses, *i.e.,*

a common modus operandi. *Lane*, 933 S.W.2d at 519 (citing *Ransom v. State*, 503 S.W.2d 810, 813 (Tex.Crim.App.1974)). Remoteness or dissimilarity does not *per se* render an extraneous offense irrelevant on the issue of identity. *Thomas v. State*, 126 S.W.3d 138, 144 (Tex.App.-Houston [1st Dist.] 2003, pet ref'd) (factors of remoteness and similarity are important, not in and of themselves, but only as they bear on relevancy and probative value of the extraneous offense evidence). The extraneous offenses and the charged offense may be different offenses as long as the similarities between them are sufficient to make the evidence relevant on the issue of identity. *Id.; Linder v. State*, 828 S.W.2d 290, 297 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd).

In his brief, Dossett concedes that identity, *i.e.,* "whether Appellant was the one who murdered Kosub," was a disputed material issue at trial. Likewise, there is no disagreement that Dossett's commission of the two aggravated sexual assaults was established beyond a reasonable doubt. Dossett argues, however, that the two extraneous offenses are not sufficiently similar to Kosub's murder to be admissible to prove identity because (1) they are different types of offenses, (2) the interval between the offenses was too great, and (3) there are too many differences between the offenses for them to constitute a "signature" of the defendant.

We note that the mere fact that the aggravated sexual assaults and the murder are different types of offenses is not determinative if the similarities are otherwise sufficient to render the evidence relevant. *Linder*, 828 S.W.2d at 297. However, in light of the Texas Court of Criminal Appeals' recent decision in *Daggett v. State*, we question whether the "other crimes" evidence in this case was admissible to prove identity, or merely tended to

prove character conformity, which is barred by Rule 404(b). *See Daggett v. State,* 187 S.W.3d 444, 451–52 (Tex.Crim. App.2005) (holding repetition of the same acts or same crime does not show a "plan" under Rule 404(b), but merely "equals the repeated commission of the same criminal offense offered obliquely to show bad character and conduct in conformity ...."). We need not determine whether admission of the "other crimes" evidence was an abuse of discretion, however, because we conclude that any error was harmless. The erroneous admission of extraneous offense evidence does not constitute constitutional error; therefore, we must disregard the error if it did not affect Dossett's substantial rights. TEX.R.APP. P. 44.2(b); *Avila,* 18 S.W.3d at 741–42. In other words, we disregard any such error if it did not adversely affect, or had only a slight effect on, the jury's verdict. *Id.* at 742; *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Here, the incriminating evidence was substantial, consisting of the DNA evidence showing that Dossett sexually assaulted Kosub (99.9% of other donors were excluded), and Dossett's own oral and written statements about the Banister Dream, which showed his detailed knowledge of the Kosub murder scene. Considering the entire record, we hold the "other crimes" evidence would have had only a slight effect on the jury's verdict, if any; thus, any error in admission of that evidence is harmless. Dossett's eighth issue is overruled.

### SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Dossett challenges the legal and factual sufficiency of the evidence to support his murder conviction.

*Standards of Review.* In determining the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex. Crim.App.2005). The jury, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony; therefore, reconciliation of any conflicts in the evidence is within the exclusive province of the jury. *Mosley v. State,* 983 S.W.2d 249, 254 (Tex.Crim.App. 1998). A jury is also permitted to make reasonable inferences from the evidence. *Id.* at 254–55.

In determining the factual sufficiency of the evidence, we view "all the evidence in a neutral light, both for and against the finding, and set aside the verdict if 'proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.'" *Vodochodsky,* 158 S.W.3d at 510. There are two ways in which evidence may be factually insufficient: (1) if the evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt; or (2) if contrary evidence exists that is strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Zuniga v. State,* 144 S.W.3d 477, 484–85 (Tex.Crim.App.2004). The appellate court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict, but must avoid substituting its judgment for that of the fact-finder. *Vodochodsky,* 158 S.W.3d at 510; *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (appellate court's evaluation should not substantially intrude upon the jury's role as the sole

judge of the weight and credibility given to witness testimony).

 **Analysis.** Without repeating our prior discussions of the evidence in this case, *supra,* we conclude the evidence was legally and factually sufficient to support the jury's verdict. The DNA evidence was a match with Dossett, with 99.9% of other donors being excluded, and Dossett's oral and written statements about his Banister Dream showed his knowledge of the murder scene, including details not released to the public, and were probative of his intent to kill Kosub. Viewing the evidence in the light most favorable to the verdict, we hold it was sufficient to enable a rational trier of fact to find all the essential elements of murder beyond a reasonable doubt. *Vodochodsky,* 158 S.W.3d at 509. The evidence contrary to the verdict consisted of the statement by a woman who worked across the street in 1983 that she saw a white pickup truck parked at Sandra Murphy Interiors around 11:00 a.m. on the day of Kosub's murder; testimony by Dossett's ex-wife that he did not own a white pickup truck in 1983; and Dr. Benjamin's expert testimony that the DNA results were not reliable due to the poorly documented chain of custody and the possibility of contamination and tampering with the Kosub samples prior to their DNA analysis in 2003. The jury is free to believe or disbelieve all or part of a witness's testimony, including an expert witness. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986). Further, the jury may draw reasonable inferences from the evidence, and may base a conviction, in whole or in part, upon circumstantial evidence. *Mosley,* 983 S.W.2d at 254–55. We conclude the evidence supporting the verdict is not too weak to support a finding of guilt, and the proof of guilt is not greatly outweighed by the contrary evidence. *Vodochodsky,* 158

S.W.3d at 510. Accordingly, we hold the evidence in this case was both legally and factually sufficient to support the jury's verdict.

### DENIAL OF MISTRIAL

 In his seventh issue, Dossett asserts the trial court erred in failing to grant a mistrial after the State elicited a comment on his post-arrest silence during the guilt/innocence phase. Specifically, Dossett complains of the following question and answer during Detective Urbanek's testimony: "And were you successful in getting him [Dossett] to record his statement about his dreams? No, I wasn't." Dossett objected that the question and answer "leaves the implication that he tried to elicit a statement from Mr. Dossett ... and Mr. Dossett did not cooperate or give a statement. We would object on the Fifth Amendment grounds to that testimony, the inferences that are drawn from it." The trial court sustained the objection. Dossett's counsel requested an instruction to disregard, and the court instructed the jury "to disregard the last question and any answer elicited." Dossett then moved for a mistrial, which was denied.

 **Standard of Review.** We review the denial of a motion for mistrial under an abuse of discretion standard. *Hawkins v. State,* 135 S.W.3d 72, 76–77 (Tex.Crim.App.2004); *Wood v. State,* 18 S.W.3d 642, 648 (Tex.Crim.App.2000). To constitute an abuse of discretion, the trial court's decision must fall outside the zone of reasonable disagreement. *Montgomery,* 810 S.W.2d at 391. A mistrial is appropriate for only "a narrow class of highly prejudicial and incurable errors" and may be used to end trial proceedings when the error is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Wood,* 18

S.W.3d at 648; *Hawkins,* 135 S.W.3d at 77. A trial court properly exercises its discretion to declare a mistrial when, due to the error, an impartial verdict can not be reached or a conviction would have to be reversed on appeal due to "an obvious procedural error." *Wood,* 18 S.W.3d at 648 (citing *Sewell v. State,* 696 S.W.2d 559, 560 (Tex.Crim.App.1983)). It is within the discretion of a trial court to deny a mistrial when an appropriate instruction would cure any resulting harm. *Id.*

**■■■■■ Analysis.** Here, the court gave an appropriate instruction to disregard and we must apply a rebuttable presumption that the jury complied with the instruction. *Thrift v. State,* 176 S.W.3d 221, 224 n. 10 (Tex.Crim.App.2005); *Waldo v. State,* 746 S.W.2d 750, 754 (Tex.Crim. App.1988). Under the facts of this case, the comment on Dossett's right to remain silent was not so highly prejudicial that it could not be cured by the instruction to disregard. *See Wood,* 18 S.W.3d at 648 (posing an improper question seldom calls for a mistrial because in most cases any harm can be cured by an instruction to disregard). A mistrial is required only when the improper question is clearly prejudicial to the defendant and "is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Id.; see also Bauder v. State,* 921 S.W.2d 696, 698 (Tex. Crim.App.1996) (mistrial is warranted only when it is apparent that an objectionable trial event is "so emotionally inflammatory" that a curative instruction is not likely to prevent the jury from being unfairly prejudiced against the defendant). Such was not the case here. Subsequent testimony by Detective Britt showed that Dossett gave two written statements about his Banister Dream in 1995, which were admitted into evidence. The single reference to Dossett's failure to give a written state-ment about the dream while he was under arrest for a separate offense in 1984, if error, was not so prejudicial that it could not be cured by the court's specific instruction to disregard the question and answer. Moreover, there is nothing in the record to suggest the jury ignored the court's instruction, and there was substantial incriminating evidence. Discontinuance of the trial was neither warranted nor required in this situation. *See Waldo,* 746 S.W.2d at 754 (considering the nature of the error, persistence of the prosecution, flagrancy of the error, particular instruction given, weight of incriminating evidence, and harm measured by severity of sentence in concluding that comment on defendant's post-Miranda silence was not so prejudicial that instruction could not cure the error). Dossett's seventh issue is overruled.

CONCLUSION

Based on the foregoing analysis, we hold the trial court did not err in admitting the DNA evidence and Dossett's oral statements regarding his dream, or in denying the motion for mistrial. Any error in admitting the "other similar crimes" evidence to prove identity was harmless. Finally, having thoroughly reviewed the record, we further conclude that the evidence is legally and factually sufficient to support Dossett's conviction for murder. Accordingly, we affirm the judgment of the trial court.