# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00638-CR

**Darren Johnson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-07-207006, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Darren Johnson of the third-degree felony offense of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04(a) (West 2003), § 49.09(b) (West Supp. 2008). Punishment was assessed at six years' imprisonment. In a single point of error, Johnson challenges the factual sufficiency of the evidence supporting his conviction. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, during the early morning hours of November 22, 2007, Officer Ricardo Medrano of the Austin Police Department's DWI Enforcement Unit noticed a vehicle traveling at a high rate of speed on South Congress Avenue. Medrano testified that he checked his radar and determined that the vehicle was going 61 miles per hour in a 40 miles-per-hour zone. Medrano initiated a traffic stop. According to Medrano, the driver of the vehicle, later identified as Johnson, "had some difficulty locating his driver's license" and "was stumbling through

the wallet trying to find it." Medrano also recalled that, while talking to Johnson, he "could smell a strong odor of alcoholic beverage emitting from his breath." Medrano testified that Johnson's eyes were "bloodshot and glassy," and his speech was "slurred in conversation." Medrano asked Johnson how much he had to drink, to which Johnson responded, according to Medrano, "that he was coming from the downtown and that he only had one beer." After Johnson exited his vehicle and walked toward him, Medrano noticed that Johnson "swayed from side to side." Medrano then asked Johnson more questions, including what and when he had been drinking. Medrano testified that Johnson told him that he had consumed only twelve ounces of Shiner Bock, and that he had started drinking at 11:00 p.m. and stopped drinking at 11:15 p.m. Medrano explained that if what Johnson was telling him was true, the odor of alcohol that he observed should have been faint, not strong, by the time the traffic stop occurred at approximately 1:30 a.m.

Medrano had Johnson perform the three standardized field sobriety tests—the HGN, the walk-and-turn, and the one-leg-stand—and an additional test, the Romberg balance test.[1] On the HGN test, which focuses on the subject's eye movements, Medrano testified that he observed "six clues" suggesting intoxication, the highest number of clues that can be observed. Additionally, Medrano noticed that Johnson "kept on moving his head" and "swayed very obviously" while taking the test. On the walk-and-turn test, Medrano testified that Johnson exhibited four out of eight possible clues, including that he "lost balance during instructions" and "failed to touch heel-to-toe." On the one-leg-stand test, Medrano testified that Johnson exhibited three out of four possible clues

---

[1] Medrano testified that the Romberg balance test was not a standardized field sobriety test, but was nonetheless "a test that I give everyone."

2

suggesting intoxication, although he did not specify what those clues were. Finally, on the Romberg balance test, Medrano testified that Johnson exhibited a "one- to two-inch sway" both "front to back" and "side to side," and that Johnson estimated 30 seconds as 33 seconds.

A videotape recording of the traffic stop was admitted into evidence and played for the jury. After the recording was played, Medrano testified:

Q: Officer Medrano, a few follow-up questions. Is it fair to say that the defendant was not staggering or falling down on the video?

A: Oh, yes, ma'am. I'll be the first one to tell you, yes, ma'am.

Q: Is it fair to say that the defendant did not look, quote unquote, drop-dead drunk?

A: I'll be the first one to tell you that, yes, ma'am.

Q: And based on your training and experience, does a person have to be staggering or falling down to be intoxicated?

A: No ma'am. That's a misnomer that people—when they see intoxicated individuals they think exactly what you said, but, no, ma'am. Again, I'll be the first one to tell you, you were not going to see it and you cannot see that.

Q: Okay. Based on your training and experience, Officer, do some persons have a higher alcohol tolerance than others?

A: Yes, ma'am, some do.

After completing the field sobriety tests, Medrano placed Johnson under arrest for driving while intoxicated. Medrano then asked Johnson for a breath sample. Medrano testified that Johnson refused. After transporting Johnson to the jail, Medrano obtained a search warrant for a blood sample. A blood sample was drawn by a nurse and analyzed by Debra Stevens, a senior

3

forensic scientist with the Austin Police Department. Stevens tested the sample to determine the grams of ethyl alcohol per 100 milliliters of blood and obtained four results—.1761, .1766, .1702, and .1698—all exceeding the legal limit of .08 grams per 100 milliliters. Stevens testified that she took the lowest of the four results and reported Johnson's alcohol concentration at .16 grams per 100 milliliters.

Based on the test results, Stevens estimated that, if Johnson had stopped drinking at 11:15 p.m., his alcohol concentration by the time of the traffic stop would have been "about a .20." On cross, Stevens estimated that, if Johnson had stopped drinking at 1:15 a.m., about fifteen minutes before the stop, alcohol could still have been entering his system at the time of the stop, which would have made his alcohol concentration lower, "perhaps as low as a .18, .19." In response to defense counsel's inquiry that "we basically don't know for sure how much Darren Johnson had to drink that night; is that correct?," Stevens replied,

> I disagree with you. We know what his alcohol concentration was. It's pretty easy to estimate based upon the amount of alcohol that was detected in his system the minimum amount of alcohol that he drank that night. To know the total amount that he drank would probably be a guess, but we can make an estimation of the minimum amount.

During redirect, the State elicited the following additional testimony on this point:

> Q: Ms. Stevens, using your estimation at .19 to a .2, based upon stopping the drinking at 11:15, could one twelve-ounce beer get you to that?
>
> A: Absolutely not.
>
> Q: Using the lowered standard that we stopped the drinking at 1:15, could one beer get you to a .18, .19?

A:     Not for the size individual that we're talking about, no, no way.

Q:     Okay.  Does changing the time that he stopped drinking, say, if we change it from 11:15 and we used a number 1:15, does that change your opinion at all as to whether or not he was intoxicated at, say, 1:30 at the time of the stop?

A:     No.  He's about two-and-a-half times the legal limit.  He certainly was intoxicated.

After Stevens testified, the State rested.  The only witness to testify for the defense was Jeff Marcum, the custodian of medical records for the City of Del Valle.  Marcum testified that Johnson suffered a back injury at some point in November 2007, the month Johnson was arrested, and received treatment for the injury in December 2007.  However, this evidence was not further developed.

The jury found Johnson guilty of committing the offense of driving while intoxicated, and Johnson was subsequently sentenced to six years' imprisonment.  This appeal followed.

**ANALYSIS**

In his sole point of error, Johnson asserts that the evidence is factually insufficient to support the jury's finding of guilt.[2]  Johnson claims that his conviction was "based in large part on the blood test results."  This is a problem, in Johnson's view, because "there is no evidence establishing the chain of custody after the jail nurse drew the blood and before Ms. Stevens analyzed

---

[2]  Johnson does not contest the legal sufficiency of the evidence.  The court of criminal appeals has recently explained that, "unlike a legal sufficiency review, which is a federal due process requirement, a factual sufficiency review is a creature of state law." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).  Therefore, "[o]n direct appeal, a court must begin its factual sufficiency review with the assumption that the evidence is legally sufficient under *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)]." *Id*.

the blood." Johnson argues that this "undermines the credibility of and reliability of the blood test results." Johnson concludes, "The government's complete failure to establish the integrity of the State's crucial piece of evidence against Appellant, along with Appellant's performance on the videotape, renders this verdict of guilt factually insufficient."

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). "A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust." *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd). Therefore, we will not reverse a judgment on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417.

The district court instructed the jury that it should find Johnson guilty of the felony offense of driving while intoxicated if it found beyond a reasonable doubt that (1) Johnson had operated a motor vehicle while "intoxicated," and (2) had two prior DWI convictions to which Johnson had stipulated. *See* Tex. Penal Code Ann. §§ 49.04(a), (b), 49.09(b). It further instructed the jury that "intoxicated" means either (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol into the body," or (2) having "an alcohol concentration of 0.08 or more." *See id*. § 49.01(2)(A), (B) (West 2003). Consequently, although Johnson focuses

6

primarily on the second theory of intoxication, factually sufficient evidence of either theory will support the jury's finding of guilt. *See Bagheri v. State*, 119 S.W.3d 755, 762 (Tex. Crim. App. 2003); *Kirsch v. State*, 276 S.W.3d 579, 584 (Tex. App.—Houston [1st Dist.] 2008, no pet. h.).

The evidence supporting a finding by the jury that Johnson did "not have the normal use of mental or physical faculties by reason of the introduction of alcohol" includes the following:

- Medrano testified that, when he pulled Johnson over for traveling more than twenty miles per hour over the posted 40-miles-per-hour speed limit, he noticed that Johnson's eyes were "bloodshot and glassy," and his speech was "slurred in conversation." Additionally, Medrano "could smell a strong odor of alcoholic beverage emitting from his breath," and observed that Johnson "had some difficulty locating his driver's license" and "was stumbling through the wallet trying to find it."

- Medrano testified that, when Johnson exited his vehicle and approached him, Medrano noticed that Johnson "swayed from side to side."

- On the HGN test, Medrano observed "six clues"—the highest number possible—suggesting intoxication. Additionally, Medrano noticed that Johnson "kept on moving his head" and "swayed very obviously" while taking the test.

- On the walk-and-turn test, Medrano testified that Johnson exhibited four out of eight possible clues, including that he "lost balance during instructions" and "failed to touch heel-to-toe."

- On the one-leg-stand test, Medrano testified that Johnson exhibited three out of four possible clues suggesting intoxication.

- On the Romberg balance test, Medrano testified that Johnson exhibited a "one- to two-inch sway" both "front to back" and "side to side."

- Johnson refused to provide a breath sample.

As for the evidence contrary to the jury's finding, Johnson asserts that "the video is the strongest piece of evidence" in his favor. He claims that the video shows him performing the

walk-and-turn test without stumbling or falling and that he "seemed to follow all instructions" when taking the test. Johnson further claims that the video shows him being able to perform the one-leg-stand test and the Romberg balance test. However, it was the jury's role, as fact-finder, to interpret what it saw on the recording, and the jury could have reasonably inferred from the recording that Johnson appeared intoxicated. Furthermore, in his testimony, Medrano addressed Johnson's behavior in the video. According to Medrano, a person can be intoxicated without appearing, in the prosecutor's words, "drop-dead drunk" or "staggering or falling down." The jury, when interpreting what it saw on the video, could have chosen to credit Medrano's testimony on this point, especially when the jury considered Medrano's experience. Medrano testified that he has been a certified peace officer for 16 years, has been with the Austin Police Department for six years, and, of those six years, has been assigned to the DWI Enforcement Unit for five. Medrano also testified that he is an instructor in how to administer the standardized field sobriety tests and has himself demonstrated the field sobriety tests for people he has stopped "many times." The jury could have credited Medrano's testimony about Johnson's performance on the field sobriety tests and discounted any discrepancies the jury may have perceived between Medrano's testimony and Johnson's appearance on the video. Additionally, the video does nothing to negate the other evidence supporting the jury's finding, including Johnson's high rate of speed while driving; his apparent difficulty in finding his driver's license; his bloodshot and glassy eyes, slurred speech, and strong odor of alcohol; the six clues Medrano observed while administering the HGN test; and Johnson's refusal to provide a breath sample. *See, e.g.*, Tex. Transp. Code Ann. § 724.061 (West 1999) ("A person's refusal of a request by an officer to submit to the taking of a specimen of breath or blood, whether the refusal

8

was express or the result of an intentional failure to give the specimen, may be introduced into evidence at the person's trial."); *Cotton v. State*, 686 S.W.2d 140, 143 n.3 (Tex. Crim. App. 1985) (noting that evidence of intoxication may include, among other things, slurred speech, bloodshot eyes, odor of alcohol, unsteady balance, and staggered gait); *Annis v. State*, 578 S.W.2d 406, 407 (Tex. Crim. App. 1979) (holding that uncorroborated testimony of arresting officer is sufficient to prove intoxication); *Kirsch*, 276 S.W.3d at 584 (considering excessive speed as evidence of intoxication); *Hennessy v. State*, 268 S.W.3d 153, 162 (Tex. App.—Waco 2008, pet. ref'd) (considering clues driver exhibited on HGN test as evidence of intoxication); *Hartman v. State*, 198 S.W.3d 829, 834 (Tex. App.—Corpus Christi 2006, pet. dism'd) ("The jury may consider the defendant's refusal to submit to a breath test as evidence of driving while intoxicated."); *Markey v. State*, 996 S.W.2d 226, 230 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (considering driver's inability to find license as evidence of intoxication); *see also Bartlett v. State*, 270 S.W.3d 147, 153 & n.20 (Tex. Crim. App. 2008) (observing that evidence of appellant's refusal to submit to breath test is relevant because it "tends to show a consciousness of guilt" on part of person refusing, although such evidence "does not establish a legally recognized presumption of consciousness of guilt that follows from the fact of refusal").

Based on the above, we cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts a finding by the jury that Johnson did "not have the normal use of mental or physical faculties by reason of the introduction of alcohol." In the alternative, we conclude that the evidence was factually sufficient to support Johnson's

9

conviction based on the theory that Johnson had a blood alcohol concentration of .08 or more. *See* Tex. Penal Code Ann. § 49.01(2)(B).

Stevens testified that, after she analyzed Johnson's blood sample, she reported Johnson's blood alcohol concentration as .16 grams per 100 milliliters, two times the statutory limit. This was actually the lowest of the four results—.1761, .1766, .1702, and .1698—that Stevens obtained during her analysis. Based on these results, Stevens estimated that Johnson's blood alcohol concentration at the time of the traffic stop was even higher—.18 to .20.

Johnson points to no contrary evidence in the record suggesting that the blood test results were incorrect. Instead, Johnson attacks the "integrity" of the evidence, asserting that the State failed to establish its chain of custody. In Johnson's view, "there is absolutely no evidence whatsoever establishing the chain of custody of the vial of blood which was taken from Appellant from the time the nurse took the blood on November 22, 2008 to the time Ms. Stevens tested the blood seven days later on November 29, 2008."

In order for the results of a blood test to be admitted into evidence, a proper chain of custody of the blood sample that was drawn from the accused and later tested must be established. *Penley v. State*, 2 S.W.3d 534, 537 (Tex. App.—Texarkana 1999, pet. ref'd). Proof of the beginning and end of a chain of custody will support the admission of the evidence in the absence of any evidence of tampering or alteration. *See Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989); *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd). Thus, any gaps or theoretical breaches in the chain of custody go to the weight of the evidence rather than to its

admissibility.  *See Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997); *Dossett*, 216 S.W.3d at 17.

The State presented evidence of the chain of custody through Officer Medrano; the nurse who performed the blood draw, Susan Williams; and Stevens.  Medrano explained that officers in the DWI Enforcement Unit carry in their patrol vehicles sealed tubes that each contain a vial used for storing blood after it is drawn by a nurse.  Medrano testified that the officer breaks the tube's seal in front of the person whose blood is being drawn so the person knows "that the blood tube has not been tampered with, that it's been sealed and it hasn't been opened or somebody else has used it."  The officer also signs the tube when it is used.  Medrano identified State's Exhibit 5 as the blood tube he used in this case, and he testified that the tube had his signature on it.

Williams testified that she drew the blood from Johnson—wiping his arm with iodine rather than alcohol—placed the blood in a vial, placed the blood in a tube, and sealed the tube.  Although Williams did not testify that she signed the tube, Williams was handed State's Exhibit 5 and asked if she recognized it.  Williams testified, "Yes, I do."  When asked what State's Exhibit 5 was, Williams testified, "It's the tube that they put the blood vial in."  The State then asked, "And is this the blood vial that belongs to the defendant containing a sample of his blood?"  Williams answered, "It's to Darren Henry Johnson."  Next, the State asked, "And once you completed drawing the blood, what did you do with the vial?"  Williams testified, "We put it into this vial and it's sealed."  When asked if she had any reason to believe that the tube had been altered or tampered with in any way, Williams answered, "No."  On cross, Williams was asked if she saw the blood

11

sample be put in the vial. Williams testified, "Yes, sir. I put the blood into the vial and the vial into that particular container."

Stevens testified that the tube was sealed when she tested the blood. She verified that her initials appeared on Exhibit 5. When asked about the chain of custody for the tube, Stevens testified that the first name on the chain of custody was Medrano, followed by other names who were not identified, and then her name last.

Johnson urges that the unidentified persons who apparently handled the tube during the seven days between his blood draw and the blood being tested could have tampered with or altered the evidence, either accidentally or intentionally. However, Johnson does not dispute the fact that the State established the beginning (Medrano) and the end (Stevens) of the chain of custody. Moreover, Johnson presented no affirmative evidence to raise an inference that the evidence had been altered or tampered with at any point either prior to or after the analysis of the blood. Medrano testified that the policy of the DWI Enforcement Unit is for the arresting officer to break the blood tube's seal in front of the person whose blood is being drawn so the person knows "that the blood tube has not been tampered with, that it's been sealed and it hasn't been opened or somebody else has used it." Medrano identified the tube used in this case, and testified that the tube had his signature on it. Williams, the registered nurse who withdrew Johnson's blood, testified that she followed the normal procedure for drawing blood, placed the blood in a vial, and sealed the vial in a tube. When asked if she had any reason to believe that the tube had been altered or tampered with in any way, Williams answered, "No." Finally, Steven testified that her initials were on the tube, and, when she brought the evidence into court, "the tube was sealed." Under these circumstances,

the only issue is the weight to be accorded the blood test results, which was the province of the jury. *See Caddell v. State*, 123 S.W.3d 722, 727 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("Objections regarding theoretical or speculative breaches in the chain, without affirmative evidence of impropriety, go to the weight of the evidence rather than to its admissibility."). We cannot say, with an objective basis in the record, that the great weight and preponderance of the evidence contradicts a finding by the jury that Johnson had a blood alcohol concentration of .08 or more. Accordingly, based on either definition of intoxication, we conclude that the evidence is factually sufficient to support Johnson's conviction for driving while intoxicated.

We overrule Johnson's sole point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: June 5, 2009

Do Not Publish

13