

# NUMBER 13-10-00337-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI–EDINBURG

DANIEL PAUL BONE,                                     **Appellant,**

**v.**

THE STATE OF TEXAS,                                    **Appellee.**

### On appeal from the 24th District Court
### of Goliad County, Texas

# MEMORANDUM OPINION

### Before Justices Rodriguez, Vela, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant, Daniel Paul Bone, appeals his conviction for intoxication manslaughter, a second-degree felony. *See* TEX. PENAL CODE ANN. § 49.08 (West 2011). After a jury trial on guilt-innocence, the trial court sentenced appellant to a term of twelve years of confinement in the Texas Department of Criminal Justice—Institutional Division. By two

issues, appellant argues: (1) the trial court erred by admitting the results of a medical blood test when the State had not demonstrated a proper chain of custody for the blood sample; and (2) without the blood evidence, the evidence was legally insufficient to support his conviction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 3:00 a.m. on September 5, 2004, appellant left for work, having consumed alcohol at a concert the previous night. Appellant's drive from his home in Premont, Texas to work was about 121 miles. At approximately 5:15 a.m., while driving his company's truck on a two-lane stretch of Highway 59 in Goliad County, in foggy conditions, appellant strayed from his northbound lane of traffic and hit a southbound vehicle head-on. The driver of the other vehicle, Juan Ramon Flores, died as a result. Appellant was transported to Christus Spohn Memorial Hospital in Corpus Christi, Texas for medical treatment. While at the hospital, his blood was drawn for medical purposes, and upon testing, it showed he was intoxicated.

During the trial, the State offered evidence of intoxication through lab records and the testimony of Alan Wells, manager of the hospital's laboratory. Based on the medical intoxication evidence and other factors, the State offered expert retrograde extrapolation testimony that appellant's blood alcohol content at the time of the accident was 0.011 to 0.144, and thus appellant was intoxicated. The State also presented expert testimony that the lack of evidence of swerving or braking to avoid the collision was consistent with intoxication. In addition, appellant's ex-wife testified she tried to talk appellant out of

2

driving to work that morning because he was too intoxicated to drive. Appellant appeals his conviction that resulted from the introduction of this and other evidence.

## II. DISCUSSION

## A. The Sufficiency of the Evidence to Support Appellant's Conviction

By his second issue, appellant contends the evidence is insufficient to support his conviction for intoxication manslaughter, arguing that should the medical blood evidence and subsequent retrograde-extrapolation evidence be excluded, the evidence does not show appellant's intoxication caused the fatal traffic accident. We disagree.

### 1. Standard of Review

Evidence is insufficient if, when viewed in a light most favorable to the verdict, a rational jury could not have found each element of the offense beyond a reasonable doubt. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia,* 443 U.S. 307 (1979)). In evaluating a legal-sufficiency challenge, we consider all of the evidence and view it in the light most favorable to the verdict. *Jackson*, 443 U.S. at 319. The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The trier of fact is the sole judge of the credibility of the witnesses and of the strength of the evidence. *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The trier of fact may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State,* 707 S.W.2d 611, 614

3

(Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) (citing *Jackson*, 443 U.S. at 319).

### 2. Analysis of the Evidence in the Record

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which defendant was tried. *Id.*

A person is considered intoxicated if that person does not have the normal use of his mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of those substances or any other substance into the body or by having an alcohol concentration above 0.08 or more in his breath, blood, or urine. TEX. PENAL CODE ANN. § 49.01(2)(A)–(B) (West 2003). In this regard, nothing in the indictment in this case required the State to prove a certain blood-alcohol concentration.

A person commits the offense of intoxication manslaughter if that person (1) operates a motor vehicle in a public place; (2) while intoxicated; and (3) by reason of that

4

intoxication, causes the death of another person by accident or mistake. *Id.* § 49.08(a); *Wooten v. State,* 267 S.W.3d 289, 294–95 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). It is not enough that operation of a motor vehicle, even when operated by an intoxicated person, causes death; rather, the State must prove that a defendant's intoxication caused the fatal result. *See Daniel v. State,* 577 S.W.2d 231, 233–34 (Tex.Crim.App.1979); *Glauser v. State,* 66 S.W.3d 307, 313 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). The State may use circumstantial evidence to prove the causal link between a defendant's intoxication and the other person's death. *See Sanchez v. State*, 398 S.W.2d 117, 120 (Tex. Crim. App. 1966) (holding evidence of manner and speed with which defendant operated his automobile before a collision was sufficient to show a causal connection between defendant's intoxication and the death of the deceased); *Kennermur v. State*, 280 S.W.3d 305, 313–14 (Tex. App.—Amarillo 2008, pet ref'd) (discussing use of circumstantial evidence to prove causal connection between intoxication and death in intoxication-manslaughter cases).

Appellant gave two different versions of the fatal auto accident. He gave one version to law enforcement on the day after the accident, and he later gave another version in a deposition in a civil lawsuit arising from the accident. Both versions were presented to the jury in this case.

On the day after the accident, appellant told Trooper Sarlls of the Texas Department of Public Safety ("DPS") that he was driving to work when this accident occurred. Appellant told Trooper Sarlls that he finished working at 11:00 a.m. on the day before the accident and that he slept for nine hours before waking up to drive to work.

5

Appellant did not inform Trooper Sarlls that he had consumed alcohol. Appellant explained to Trooper Sarlls that he was familiar with the road, and that as he drove in the northbound lane, Juan Ramon Flores ("Juan") entered his lane from the southbound lane. Appellant said that in an attempt to avoid the accident, he swerved to the left because there was a ditch to his right. According to appellant, Juan then corrected his path of travel, but in doing so struck the truck appellant was driving. In this account, appellant stated the collision occurred in Juan's lane of travel.

In the portions of the civil deposition which were read into evidence, appellant testified the collision occurred in his own, northbound lane of travel. Appellant testified that after crossing over a hill at 65 miles per hour, his visibility completely diminished due to fog. He saw two headlights "coming at" him in his lane, and he looked down at the road to see where he was. He saw that he was in his own, northbound lane of travel, with the passenger-side tires of his truck almost on the white line, marking the shoulder lane. When he saw two headlights in the center of the hood of his truck, he dropped speed, although he could not say by how much. Appellant testified he did not remember swerving. He "just got hit." Appellant testified he was looking "directly" at the oncoming vehicle's headlights when the accident occurred. Appellant could not say whether his vehicle rolled over. His next memory was someone yelling "fuel leak" and "fire."

In his deposition, appellant testified about his activities before he left for work. He testified that on September 4, he woke up at 6:00 o'clock p.m. to get ready to go to an outdoor concert with his wife and others. Appellant testified that at the concert, between 8:00 p.m. and midnight, he consumed two mixed drinks and four beers. He left the

6

concert at about 1:30 or 2:00 a.m.

Appellant's ex-wife, Sandra Haywood, who was married to him at the time of the accident, testified that prior to drinking at the concert, appellant arrived home from work in the afternoon, and she could see that he had been drinking alcohol. She further testified appellant was loud and staggering at the concert due to intoxication. Haywood testified that appellant was intoxicated when he left the concert. She followed behind him in her truck as appellant drove home from the concert in his personal truck. He was swerving off the road as he drove home. Haywood testified that prior to appellant leaving home for work, she tried to persuade him not to drive because he was intoxicated.

The deceased's brother, Albert Flores, testified at trial that his brother, Juan, was approximately 31 years old at the time of the accident, was engaged to be married, and did not drink alcohol. At the time of the accident, Juan was driving to Laredo to meet Albert who was arriving at a bus station. There was no physical evidence at the scene of the accident to suggest Juan caused the accident.

Sergio Nieto testified that he was hauling a boat to a family reunion and driving in the southbound lane when he struck Juan's truck. This happened after appellant's collision with Juan's truck. Although it was foggy, Nieto could still see the center stripe on the highway and tried to avoid the accident. Nieto's testified he believed he rear-ended Juan's truck. Nieto's pick-up truck ended up facing south, but in the middle of the road, blocking both lanes of traffic. Nieto's boat and boat trailer became detached and later a fourth driver, who did not testify at trial, crashed his truck into Nieto's boat. Nieto exited his truck and saw that half of Juan's truck was gone on the driver's side.

7

Juan's left arm was severed at the elbow, the torso portion of his body was extended out from the passenger cab of the truck, and there was a large amount of blood in the cab. Juan was dead when Nieto saw him. Nieto briefly saw appellant at the scene, and appellant was taken from the scene by life flight minutes later.

Deputy Virginia Escojido of the Goliad Sherriff's Department was the first law-enforcement officer to arrive at the scene. She arrived at about 5:30 a.m. Deputy Escojido testified that though it was very foggy and dark, one could see the lane in which he or she was driving. She also testified there was a strong odor of burning oil or gasoline at the scene. Neither she nor any other witness testified to smelling alcohol at the scene, but the first priority was to stop traffic, to prevent other collisions, and to look after those who may have been injured.

Yancy Arrington, a professional engineer, testified that an attorney for Juan's family hired him to perform accident reconstruction services. Arrington testified that over a year after the accident, he collected data at the accident scene, examined photographs of the scene, and corroborated the DPS scale drawing of the area where the accident happened. Arrington testified Juan's Toyota Tacoma truck weighed about 3,200 pounds, whereas appellant's truck, a loaded heavy-duty truck for working at an oilfield, weighed about 6,500 pounds. Juan and appellant's trucks were each approaching a bridge crossing. About 200 feet back from the point of impact, appellant started drifting across the center line into Juan's lane. Appellant struck the front, left driver's side portion of Juan's truck. The maximum force engagement was the moment the front tires of the two trucks collided, causing the tires to detach. Appellant's truck then moved

8

along the side of Juan's truck, removing the bottom half of Juan's truck. After the impact, Juan's vehicle rolled, causing the roof to collapse.

Arrington testified that all of the physical evidence, such as gouge marks in the pavement and fluids from the trucks, was in the southbound lane. Arrington testified that had appellant's deposition version of the accident been correct, appellant's truck would have come to rest on the northbound side of the highway. The pictures, however, showed appellant's truck landed in an embankment on the southbound side of the highway. Arrington testified the subsequent collision involving Nieto could not have caused any of the damage to the "occupant" area of Juan's truck. Without objection, Arrington testified that two other engineering firms had performed accident reconstruction analysis of this accident and reached the same conclusions as he did concerning how the accident occurred.

The State also presented testimony from two DPS Troopers certified in accident reconstruction, Trooper Frank Casillas and Trooper C.J. Villarreal. Trooper Casillas was present at the accident scene the day the accident happened, whereas Trooper Villarreal examined the scene at a later date and made a scale drawing. Trooper Casillas testified a gouge mark is where a non-rubber portion of a vehicle leaves a groove in the pavement during an auto accident. Gouge marks can indicate the direction of vehicular movement during an accident. Trooper Casillas testified the gouge marks at the scene showed appellant's truck entered Flores's lane of travel and that there was no chance the impact occurred in appellant's northbound lane of travel. Trooper Casillas testified appellant had plenty of room to move to his right out of Juan's lane to avoid the accident. Trooper

9

Casillas testified there was no evidence, such as skid marks, that either driver took any action to avoid the accident. Trooper Villarreal testified that all of the gouge marks were in Juan's southbound lane, thereby showing the accident occurred in Juan's lane. Trooper Villarreal also testified there was no evidence appellant applied his brakes before the impact.

The defense called Trooper Sarlls as a witness. He was present at the accident scene and wrote the initial DPS major-accident report. In the report, Trooper Sarlls attributed the accident to heavy fog and included the description of events appellant provided him the day after the accident. At that time, Trooper Sarlls believed the accident occurred in Juan's lane. However, based on appellant's account that he slept nine hours before driving and had moved into Juan's lane as an evasive action, Trooper Sarlls concluded the gouge marks in Juan's lane were consistent with evasive action. He testified appellant was removed from the accident scene before he arrived and that had he known of appellant's intoxication prior to the accident, he would have investigated differently.

Trooper Sarlls testified there was no evidence that showed the accident occurred in appellant's northbound lane of travel; no physical evidence that Juan ever left his lane of travel; and that the lack of skid marks from appellant's vehicle at the scene was consistent with intoxication. Trooper Sarlls testified that after DPS learned of appellant's intoxication, DPS created a corrected report which recognized intoxication as the cause of the accident. On cross examination, Trooper Sarlls agreed with the prosecutor that because of the heavy fog, appellant's story that he saw headlights from some distance

10

moving into his lane was "silliness"—the fog was too thick to allow one to see headlights in the distance.

Appellant states in his brief that he does not dispute the sufficiency of the evidence in the event the blood evidence and subsequent extrapolation testimony are considered. However, after reviewing the entire record, we conclude that even without the blood evidence and subsequent extrapolation testimony, a rational jury could have found beyond a reasonable doubt that appellant committed the offense of intoxication manslaughter. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (explaining that an appellate court considers admissible and inadmissible evidence in performing a sufficiency review); *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

A jury may infer a consciousness of guilt from a defendant's changing story about the crime and the surrounding circumstances. *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1993, pet. ref'd). "A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd.) (quoting *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.)). "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt,' may be received as a circumstance tending to prove that he committed the act with which he is charged." *Torres*, 794 S.W.2d at 598 (internal quotations omitted).

The jury could have reasonably inferred from appellant's changing story that he

11

lied about how the accident happened because he had something to hide.  *See Couchman*, 3 S.W.3d at 164.   In addition, the expert testimony showed appellant was intoxicated and thereby caused the accident.   Multiple witnesses testified that although it was foggy, one could see the lanes on the ground.   Appellant did not brake to avoid the collision.  *See Kuciemba v. State*, 310 S.W.3d 460, 463 (Tex. Crim. App. 2006) (holding that the "driver's failure to brake provides some evidence the accident was caused by intoxication").   We conclude the cumulative force of the circumstantial evidence was sufficient to find appellant guilty beyond a reasonable doubt, with or without the blood and extrapolation evidence.   *See Powell*, 194 S.W.3d at 507.   Appellant's second issue is overruled.

## B.   The Admissibility of Blood Evidence that Showed Appellant's Intoxication

By his first issue, appellant argues the trial court erred by admitting into evidence the results of his medical blood draw which indicated he was intoxicated, because the State did not establish a proper chain of custody to support admission of the blood-test results.   Appellant further complains the State's witness, Alan Wells, the Laboratory Manager of Christus Spohn Memorial Hospital, lacked firsthand knowledge of the chain of custody for the blood sample, and that the State failed to present testimony from the person who drew the blood and the person who analyzed the blood.

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard.  *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).   Although the Texas Rules of Evidence do not define the term "chain of custody," Rule 901(a) provides that the "requirement of authentication or identification as a condition

precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See* TEX. R. EVID. 901(a). The court properly admits evidence when a reasonable juror could find that the evidence was authenticated. *Pondexter v. State*, 942 S.W.2d 577, 586 (Tex. Crim. App. 1996).

Proof of the beginning and end of a chain of custody will support the admission of the evidence in the absence of any evidence of tampering or alteration. *Dossett v. State,* 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd); *Durrett v. State*, 36 S.W.3d 205, 208 (Tex. App.—Houston [14th Dist.] 2001, no pet.) Gaps or theoretical breaches in the chain of custody do not affect the admissibility of the evidence absent affirmative evidence of tampering or commingling; any gaps go to the weight of the evidence rather than its admissibility. *Dossett*, 216 S.W.3d at 17; *Durrett*, 36 S.W.3d at 208; *see also Lagrone v. State,* 942 S.W.2d 602, 617 (Tex. Crim. App. 1997).

In *Durrett,* none of the witnesses could recall who actually drew the medical blood sample from the defendant and a medical technologist admitted on cross examination that he lacked an independent recollection of testing the blood. *See Durrett*, 36 S.W.3d at 209–11. The Fourteenth Court of Appeals held that the beginning and end of the chain of custody were proved by witnesses who testified that a physician requested the blood sample, which was identified as Durrett's at the time it was collected for analysis by an emergency room employee pursuant to hospital policies and procedures, and where the blood sample was promptly sent by pneumatic tube to the hospital laboratory for analysis by a medical technologist. *Id.* at 210. Because Durrett did not claim there was any tampering with or alteration of the evidence, or suggest that hospital procedures were

13

not followed, proof of the beginning and the end of the chain of custody was sufficient to support admission of the evidence.  *Id.* at 211.  The appeals court held that the fact that no witness could recall taking the blood and the fact that another witness gave contradictory testimony on whether he recalled testing Durrett's blood sample, went to the weight, not the admissibility, of the evidence.  *Id.*; *see also Torres v. State,* No. 04–07–00522–CR, 2009 WL 89695, at *4–5 (Tex. App.—San Antonio Jan. 14, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that evidence of established, routine procedures for medical blood tests, in the absence of evidence the procedures were not followed, is sufficient grounds for the trial court to admit the results of a medical blood test).

Alan Wells, the Laboratory Manager of Christus Spohn Memorial Hospital, testified he was the custodian of the lab records.[1]  He testified that the laboratory manager who was working when appellant's blood was drawn in 2004, relocated to San Antonio before Wells started working as the manager.  As manager, Wells's responsibilities included supervision of personnel and ensuring proper maintenance and performance of lab equipment.  Wells explained that since 1988, he had continuously served as a laboratory manager in a Christus Spohn or Christus hospital, and that in all hospitals accredited by the College of American Pathologists ("the College"), the labs follow the same protocols. Wells testified that from 2004 through the time of trial, Christus Spohn Memorial's lab was certified by the College and passed the College's tests for maintaining certification. According to Wells's testimony, the protocols he described concerning the chain of

---

[1] The lab records concerning the testing of appellant's blood were admitted into evidence as business records and were marked State's Exhibit 7 and 8.  Exhibit 8 shows the results of the blood test and shows appellant was intoxicated when his blood was drawn at the hospital.

custody for a blood sample were in place at Christus Spohn Memorial Hospital in 2004, when appellant's blood was drawn and tested.

Wells testified the protocols required the lab to periodically test samples the College sent to the lab, so the College could confirm the accuracy of the lab's work. The College performed biannual (i.e., every other year), in-person surveys of the lab, to ensure it met applicable laboratory standards and also required the lab to regularly complete and submit self surveys. Wells testified that the hospital performed daily, weekly, and monthly preventative maintenance on the Roche Cobas 800 machine used to analyze appellant's blood, and that the manufacturer of the machine also visited the hospital periodically to provide upgrades and to perform preventative maintenance. The lab tested two quality-control samples daily. The lab also subscribed to a inter-laboratory service which allowed the lab to compare its results to all of the other labs in the country using the same machine. Wells testified that in 2004, about 300 to 330 hospitals in the country were using the Roche Cobas 800 machine. Wells testified at considerable length that because seventy to eighty percent of all medical decisions are based on the results of lab work, it is critical that samples be linked to the correct patient and that results be correct. Wells described accuracy in the lab work as a matter of life-and-death importance.

As to the handling of an individual blood sample, Wells testified that each patient admitted to the hospital from the emergency room was assigned an identification number and issued a wrist band which showed the patient's name and unique identification number. Once a physician ordered a blood test, labels with bar codes and the patient's

15

identification number and name were automatically generated. The person drawing the blood then checked the label against the person's wrist band, confirming the patient's name and identification number, before collecting the blood sample and placing the label on the sample. The person then placed his or her initials and the time of the blood draw on the label. The blood was then taken to a computer that read the bar code and then told the machine which tests to run on the blood.

Wells testified that per hospital protocol, isopropyl alcohol was used to clean the site on the patient when taking a blood sample. Because the Roche Cobas 800 machine performed an alcohol dehydrogenase test for the presence of ethanol, it did not matter that isopropyl alcohol was used in taking the blood sample. Wells explained the alcohol dehydrogenase test involved the machine taking a small sample of the patient's blood serum, placing it in a reaction cup, adding a reagent to it, and immediately taking a 'reading.' The reading consisted of the machine shining a light through the sample, measuring the amount of light absorption at two different times, and comparing the difference in absorption at the two times against a curve. The difference in absorption correlated to a certain concentration of alcohol in the person's blood. Wells explained that alcohol dehydrogenase testing was widely accepted in the scientific community, used in approximately 1,700 other hospitals in 2004, and that the Food and Drug Administration approved the Roche Cobas 800.

Based on the records admitted into evidence,[2] Wells testified a registered nurse drew appellant's blood, and that a competent, trained technologist tested his blood. At

_____

[2] On appeal, appellant does not challenge the admission into evidence of any medical records as business records. We also note that in connection with Wells's testimony, appellant did not obtain a ruling

16

the time of trial, the technologist had worked in the same lab for approximately forty-four years. Wells testified from State's Exhibit 8, the lab report showing the results of the blood test, that appellant was intoxicated when his blood was drawn at the hospital. The record contains no evidence of tampering with appellant's blood sample or of any failure to follow the established protocols to which Wells testified.

On this record, we cannot say the trial court abused its discretion by admitting the blood evidence because the State presented sufficient evidence to support a finding of authentication. *See* TEX. R. EVID. 901(a); *Durrett*, 36 S.W.3d at 211. Appellant's first issue is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

_____
Gregory T. Perkes
Justice

Do not publish. TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of February, 2012.

---

on his initial objection to the admissibility of medical records as business records. In addition, before Wells testified that he was the custodian of the lab records, appellant objected, without obtaining a ruling, that the State had not shown Wells was the custodian of the medical records and lab records. *See* TEX. R. APP. P. 33.1.

17