

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00526-CR

---

QUENTIN WASHINGTON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

### FROM THE 211TH DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. F-2012-2475-C

----------

## MEMORANDUM OPINION[1]

----------

Appellant Quentin Washington appeals his convictions for five counts of aggravated sexual assault.[2] In two points, he contends that the trial court erred by admitting printouts generated by a cell-phone extraction device and by

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Penal Code Ann. § 22.021(a)(1)(B)(iii), (2)(B) (West Supp. 2014).

admitting urine-test results showing that he had a sexually-transmitted disease. We affirm.

## Background Facts

A.H. (Mother) moved with her children, including her daughter R.A. (Rita), to Lewisville in 2010.[3] Upon arriving there, Mother met appellant. At first, Mother believed that appellant was a "great guy"; she and the children were living on tight finances, and he helped her pay for food and transportation. Later, appellant allowed Mother and the children to move in with him. He drove a tow truck to make money, and Mother and the children sometimes went with him on jobs. Mother believed that Rita considered appellant to be a father figure.

In 2012, appellant occasionally stayed at his house with the children when Mother, who was a nurse, went to work. One day in August 2012, when Rita was thirteen years old, appellant spoke with Mother about a "new little girl" that Rita knew. Concerned that Rita was having a sexual relationship with the girl, Mother spoke to Rita but "wasn't convinced" about Rita's explanation of the relationship. Thus, Mother took Rita's cell phone (which appellant had bought for her) and began to read text messages that it contained. Upon doing so, Mother saw graphic text messages between appellant and Rita that indicated they were having sex.

---

[3]To protect the complainant's anonymity, we will use initials and aliases to refer to her and to her mother. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

When Mother confronted appellant through a text message about having sex with Rita, he texted back to Mother that he was sorry and asked for forgiveness. Appellant never denied in his subsequent text messages that he had engaged in a sexual relationship with Rita; instead, he repeatedly apologized, expressed his desire to "fix it," and implored Mother to not call the police. Appellant also stated in a text message that if Mother "call[ed] the laws," he would turn himself in. He recognized in a text message that he "might get like 20 years."

In response to Mother's questioning, Rita initially denied having sex with appellant because she did not want him to go to jail. Later, she admitted to having sex with him twice. Mother did not believe Rita's statement that the sex had only occurred twice. Mother called the police about the sexual assaults.

By appellant's prompting, Rita told the police that she had been a willing participant in having sex with appellant and asked the police not to "take him." Mother believed that Rita was trying to protect appellant. Eventually, Rita participated in a forensic interview. She also saw a sexual assault nurse examiner. She told the nurse examiner that multiple sexual assaults had occurred. Appellant went to Port Arthur, and Mother and the children continued to stay in his house for several months.

The police arrested appellant while he was living near Houston. A grand jury indicted him with five counts of aggravated sexual assault against Rita. Before trial, the State notified appellant of its intent to present evidence of

3

"multiple inappropriate and sexual" text messages that he had sent to Rita. Appellant pled not guilty to all counts.

At trial, Rita testified that beginning in April 2012, appellant had touched her inappropriately and had made her touch him inappropriately. Specifically, she testified that the touching had first occurred over clothes and that later, on five occasions, she and appellant had sexual intercourse. Rita testified that she was scared while having sex with appellant and that the sex had hurt her. The State introduced evidence of text-message exchanges between appellant and Mother and between appellant and Rita. These exchanges appeared to corroborate Rita's testimony about appellant's sexual relationship with her.

After the parties finished presenting evidence and arguments, a jury convicted appellant of all five counts. The trial court set his sentences at forty years on each count, running concurrently.[4] Appellant brought this appeal.

### Admissibility of Cell-Phone Extractions

In his first point, appellant argues that the trial court erred by admitting printouts from the extractions of Mother's and Rita's cell phones without receiving evidence that established the reliability of the scientific theory underlying the extraction device, proof that the particular devices at issue were working correctly on the date they were used, and the qualifications and competency of the devices' operators. We review a trial court's admission of evidence over a

_____

[4]During the punishment phase, the State presented evidence of appellant's prior crimes, including murder.

4

defendant's objection for an abuse of discretion. *Sanders v. State*, 422 S.W.3d 809, 812 (Tex. App.—Fort Worth 2014, pet. ref'd). An abuse of discretion occurs when a trial court's decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *Id.* at 812–13.

Near the beginning of the trial, outside of the presence of the jury, the trial court held an evidentiary hearing on the admissibility of records from the extraction of Mother's cell phone. Shawn Dority, a detective with the Lewisville Police Department (LPD), testified that he performs approximately two cell phone extractions per month, had been doing so for about a year and a half, and had received training in extractions through a twenty-hour course. He testified that he had extracted Mother's cell phone in August 2012 by connecting the phone to a "piece of computer equipment that [took] the data on the cell phone and copie[d] it over to another location."

Specifically, Detective Dority testified that the LPD uses a "UFED Cellebrite" device to extract data from cell phones. This device comes with "a large amount of different cables for each . . . kind of cell phone," and the person extracting data selects the model of phone on a list after connecting the device. Detective Dority explained that he knew the phone in question had been successfully extracted because the UFED Cellebrite stated that extraction had occurred and output a report to a memory stick. He also testified that the UFED Cellebrite does not allow a user to alter extracted information from the phone. Detective Dority identified State's Exhibit 1—a printout of text messages

5

exchanged between two phone numbers—as the data extracted from Mother's phone. On cross-examination, Detective Dority admitted that he did not know what the letters in "UFED" represented, that he did not know technological details about how the UFED or cell phones worked, that the UFED and cell phone in question had not been tested on the day of the extraction to determine that they were working properly, and that there was no way to conclusively determine that any particular person sent a text message from a cell phone number that appeared on the report.

After Detective Dority's testimony concluded, appellant objected to the admission of State's Exhibit 1. He compared the cell-phone extraction device to an Intoxilyzer and stated,

> [I]n order to introduce those results, they've, one, got to prove the machine functioned properly on the day of the test as evidenced by running a reference sample through the machine. And that wasn't done here.
>
> They have to have existence of periodic supervision over the machine and operation by somebody who understands the scientific theory of the machine, which they don't have here.
>
> They have to have proof [of] the results of the test by a witness . . . qualified to translate or interpret such results so as to eliminate hearsay.
>
> In addition to that, unlike the [I]intoxilyzer where you're interpreting the results of alcohol based on the machine's interpretation, here you have . . . hearsay based on hearsay based on hearsay in that what they're attempting to do is extract information . . . from a telephone that they don't know whether it's working properly for numbers that they don't know who they really belong to or be able to show that it came from that person.

The trial court overruled appellant's objection on the condition that before presenting the exhibit showing the text messages to the jury, the State "tie[d] [it] up" by having Mother corroborate details regarding the messages.

In front of the jury, Detective Dority testified that through the UFED Cellebrite, he extracted information, including text messages, from a certain cell phone and generated a printout containing that information. Appellant renewed his objections to the admission of State's Exhibit 1, but the trial court overruled them and admitted the exhibit for record purposes only.

During Mother's testimony, she confirmed that State's Exhibit 1A, a selection of some pages from State's Exhibit 1, comprised "[t]ext messages between [appellant] and [her]self." She told the jury what her and appellant's cell phone numbers were and stated that the messages in State's Exhibit 1A were a fair representation of exchanges between her and appellant. Later, Mother again identified the items on State's Exhibit 1A as text messages that came off of the cell phone that she had given to the police.

Similarly, outside of the presence of the jury, Eric Beckwith, an investigator with the Denton Police Department, testified that he had received in-house training on using a Cellebrite UFED, that he had been using the device for at least two years and had extracted at least fifty phones, and that he had extracted Rita's cell phone. Appellant objected to the admission of a document produced from that extraction on similar grounds to his objection to the admission of State's

7

Exhibit 1.[5]  The trial court overruled the objection and admitted State's Exhibit 4 for all purposes.  At the time that the court did so, Rita had already identified State's Exhibit 4 as containing accurate transcriptions of text–message exchanges between her and appellant.  In front of the jury, Officer Beckwith testified about the extraction, identified State's Exhibit 4 as the chronological report generated by the extraction, and read some of the text-message exchanges on the exhibit.

On appeal, citing *Kelly v. State*, appellant contends that the cell-phone extractions comprised novel scientific evidence that required a finding of reliability and relevance before admission.  *See* 824 S.W.2d 568, 573–74 (Tex. Crim. App. 1992) (deciding the admissibility of inculpating DNA evidence).  He argues that the trial court did not hold a "gate keeping" hearing and that officers Dority and Beckwith did not have sufficient knowledge of the devices to establish that they produced reliable results.  Also, citing *Harrell v. State*, appellant contends that there was "no showing that anyone with technical expertise maintained the UFED [devices] . . . or that [they were] functioning properly on the day [they were] used."  *See* 725 S.W.2d 208, 209–13 (Tex. Crim. App. 1986) (analyzing whether part of a breath-test machine was properly certified as required by regulations in the administrative code and whether results from the

---

[5]Later, in the punishment phase of the trial, appellant conceded that these exhibits correctly depicted text-message conversations between him and Mother and between him and Rita.

machine were admissible). Appellant also compares this case to *Hernandez v. State*, in which the court of criminal appeals analyzed the admissibility of drug-test results that were sponsored by a witness who had used a urinalysis machine but did not provide testimony about the machine's scientific reliability. 116 S.W.3d 26, 29–31 (Tex. Crim. App. 2003).

The types of evidence in the cases appellant cites differ from the evidence at issue here. Those cases involved testimony about the collection, analysis, and incriminating effects of biological evidence (urine, blood, semen, and breath) that was not amenable to precise independent corroboration or confirmation by untrained lay witnesses or proper application by an untrained judge or jury without supporting expert testimony. *See id.* at 27–28 (indicating that the result from a urinalysis machine was the sole reason supporting the revocation of a defendant's community supervision); *Kelly*, 824 S.W.2d at 569–71, 574 (establishing that expert testimony explained the uniqueness of each person's DNA along with DNA extraction and comparison techniques).

To be sure, the requirements of relevancy and reliability for the admission of scientific evidence apply to more types of evidence than the biological evidence at issue in *Hernandez* and *Kelly*. *See, e.g.*, *Krause v. State*, 243 S.W.3d 95, 108–10 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Williford v. State*, 127 S.W.3d 309, 312 (Tex. App.—Eastland 2004, pet. ref'd) (applying the *Kelly* requirements for the reliability of scientific evidence to testimony about data copied from a computer's hard drive). But those requirements arise from the

principle that "[s]cientific evidence has the ability to mislead a jury that is not properly equipped to judge the probative force of the evidence." *Layton v. State*, 280 S.W.3d 235, 241 (Tex. Crim. App. 2009). Thus, under rule of evidence 702, "it is the responsibility of the trial court to determine whether the scientific evidence offered is sufficiently reliable, as well as relevant, *to help the jury in reaching accurate results*." *See id.* (emphasis added); *see also* Tex. R. Evid. 702. This places the trial court "in the role of a 'gatekeeper,' whose responsibility it is to weed out inadmissible evidence based on a lack of reliability." *Layton*, 280 S.W.3d at 241; *see Somers v. State*, 368 S.W.3d 528, 535 (Tex. Crim. App. 2012) ("The threshold determination in an inquiry into the admissibility of scientific evidence is whether the evidence is helpful to the trier of fact, and for such evidence to be helpful, it must be reliable."); *Coleman v. State*, 440 S.W.3d 218, 226 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("[T]he party offering scientific expert testimony must demonstrate, by clear and convincing evidence, that this testimony is sufficiently reliable and relevant to assist the factfinder in reaching accurate results.").

Applying the controlling principle of reliability to the particular circumstances of this case,[6] we cannot hold that the trial court abused its

---

[6]We do not opine about the general reliability of cell-phone extractions, on the particular reliability of an extraction obtained through a UFED Cellebrite, or on the type or extent of testimony required for admission of cell-phone extraction reports when they are not independently corroborated by the owner or possessor of the cell phone in question.

discretion by admitting the cell-phone extraction reports because the combination of the officers' testimony with Mother's and Rita's uncontroverted testimony empirically showed that the extractions accurately copied and displayed text-message exchanges from Mother's and Rita's phones. Before the trial court admitted State's Exhibit 1A, Detective Dority testified that he had received training in cell-phone extractions and had completed many extractions, that he had used the UFED Cellebrite to extract text messages in this case, and that he knew the extraction was successful because of information produced by the UFED Cellebrite. Mother then confirmed that State's Exhibit 1A—comprising a small part of the lengthy extraction report—matched text-message exchanges between her and appellant that were taken from her cell phone. This testimony, taken together, confirmed that the UFED Cellebrite worked correctly and produced reliable results when Detective Dority used it. Similarly, Officer Beckwith's and Rita's testimony, taken together, establish that the UFED Cellebrite accurately produced the text-message exchanges between appellant and Rita that the State presented to the jury.

Because the trial court did not abuse its discretion by implicitly finding that the extraction devices reliably copied the information from Rita's and Mother's cell phones and by therefore admitting the printouts from the cell-phone extractions, we overrule appellant's first point. *See Sanders*, 422 S.W.3d at 812; *see also United States v. Marsh*, 568 Fed. Appx. 15, 16–17 (2d Cir.) (holding that a trial court did not abuse its discretion by admitting an officer's testimony about

11

cell-phone extractions through a UFED Cellebrite when the officer "confirmed the results by checking the messages on the phone itself"), *cert. denied*, 135 S. Ct. 111 (2014); *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) (stating that the reliability inquiry is "flexible" and may sometimes depend on personal knowledge rather than scientific expertise).

### Chain of Custody

In his second point, appellant contends that the trial court erred by admitting results from testing of urine for chlamydia because the State allegedly failed to prove a proper chain of custody of the urine. LPD Detective Richard Anders testified that appellant consented to give a urine sample. Detective Anders also testified that he took appellant from a county jail to a lab to complete the test. According to Detective Anders, after appellant drank several cups of water, he urinated into a cup, and a staff member at the lab put a lid on the cup, labeled it, and left the room with it.

Amy Clark, a medical assistant, testified that she prepared appellant's urine to be tested. Specifically, she testified that a urine sample that was labeled with appellant's name was in the lab when she came back to the office from her lunch break. Clark stated that there were no other samples of urine nearby for which appellant's sample could have been mistaken. She explained that she put part of the urine sample into a different container that was also labeled with appellant's information; sealed the container; placed the container, along with a

12

requisition form, in a bag for later collection by LabCorp; and discarded the rest of the urine.

Clark also testified that inmates are brought to the office at a time when other patients are not there and that any other urine samples that could have been given on the day of appellant's sample had already been processed and were "out of the way."[7] She admitted, however, that she did not know who initially collected the urine sample bearing appellant's label. Clark explained that samples of urine collected in the office are labeled, sealed, and picked up by LabCorp, which tests the samples. Mark Spade, who works for LabCorp, testified that the sample bearing appellant's label tested positive for chlamydia.

When the State sought to admit its Exhibit 9—a lab requisition form concerning appellant's test for chlamydia—appellant objected on the ground that the State had not adequately proved chain of custody of the urine sample. He contended, "[W]e have no way to show exactly that it was his urine because we don't even know who took it." The trial court overruled appellant's objection. Then, during Spade's testimony, the trial court admitted, over appellant's objection, a document showing the positive result of the urine test for chlamydia.[8]

---

[7]Another witness testified that while appellant's urine was collected after noon on the day he came to the office, the most recent previous collection of urine in the office occurred at 9 a.m.

[8]While appellant's urine tested positive for chlamydia, a urethral swab tested negative. Rita also tested positive for chlamydia. She testified that she got chlamydia from appellant and that she had never had sex with anyone else when she got it.

13

Citing only one case,[9] appellant argues that the "combined testimony of the lab employees is not enough to show the proper chain of custody of appellant's urine." Proof of chain of custody authenticates evidence under rule of evidence 901(a). *See* Tex. R. Evid. 901(a); *Druery v. State*, 225 S.W.3d 491, 503 & n.30 (Tex. Crim. App.), *cert. denied*, 552 U.S. 1028 (2007)). We have explained that proof that validates the beginning and the end of a chain of custody

> will support the admission of evidence, barring any evidence of tampering or alteration. Without evidence of tampering or commingling, gaps or theoretical breaches in the chain of custody go to the weight of the evidence, not its admissibility. Additionally, a mere showing of the opportunity for tampering or commingling, absent affirmative evidence of such, is not sufficient to require exclusion of the evidence.

*Patel v. State*, No. 02-08-00032-CR, 2009 WL 1425219, at *2 (Tex. App.—Fort Worth May 21, 2009, no pet.) (mem. op., not designated for publication) (citations omitted); *see Druery*, 225 S.W.3d at 503–04 ("Absent evidence of tampering or other fraud, . . . problems in the chain of custody do not affect the admissibility of the evidence. Instead, such problems affect the weight that the fact-finder should give the evidence, which may be brought out and argued by the parties." (footnote omitted)); *McGregor v. State*, 394 S.W.3d 90, 125 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("Any gaps and minor theoretical breaches go to the

---

[9]*Rodriguez v. State*, 2 S.W.3d 744, 746–48 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (analyzing the sufficiency, rather than the admissibility, of urinalysis evidence).

weight rather than the admissibility of the evidence, absent a showing of tampering.").

Appellant does not assert that the urine sample that tested positive for chlamydia was tampered with; he argues only that the evidence does not sufficiently establish an intermediate link in the chain of custody between the staff member's collection of the cup that appellant urinated in and Clark's handling of the specimen. But Detective Anders testified that he was present when appellant urinated and that he saw a staff member label, seal, and take the cup containing the urine, and Spade testified that he tested a urine sample that purported to connect to appellant.

Because we conclude that the evidence sufficiently establishes the beginning and end of the chain of custody of appellant's urine sample and that there is no affirmative evidence of tampering or alteration, we hold that the trial court did not abuse its discretion by admitting results of the urinalysis. *See Patel*, 2009 WL 1425219, at *2–3; *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd). We overrule appellant's second point.

**Conclusion**

Having overruled appellant's points, we affirm the trial court's judgment.

/s/ Terre Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 5, 2015